**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0581n.06

Case No. 16-5195

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Oct 25, 2016
DEBORAH S. HUNT, Clerk

JIMMY MATHIS,

    Plaintiff-Appellant,

v.

CITY OF RED BANK,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

BEFORE: STRANCH and SUTTON, Circuit Judges; STEEH, District Judge.*

SUTTON, Circuit Judge. In 1997, the City of Red Bank hired Jimmy Mathis to work as a laborer for its Department of Public Works. He worked his way up to Assistant to the Public Works Director in 2002, a title he held for over ten years, even as the responsibilities of his job evolved. Mathis was diagnosed with lupus in 2012. The City started the interactive process required by the Americans with Disabilities Act to determine how, if reasonably possible, it could accommodate his disability. In response to a question from the City about whether Mathis could perform a job that included any work outside, Mathis's doctor said: "[M]y simple reply is that he must work only indoors, period. . . . The disease is a lifelong genetic disorder triggered by ultraviolet light. . . . Only God knows whether he can tolerate sun exposure at all or if so how much." R. 11-21. Because Mathis's doctor concluded that his work must be indoors and

---

* The Honorable George Caram Steeh, United States District Court Judge for the Eastern District of Michigan, sitting by designation.

because no such jobs were available for which he was qualified, the City had to lay him off. Mathis filed this lawsuit in response, seeking damages under the Americans with Disabilities Act. The district court granted summary judgment for the City because it had done all it could reasonably do to accommodate Mathis's disability. We agree and affirm.

I.

Mathis started working for the City as a Laborer in 1997. In July 2002, after five years of moving among three other jobs within the Department, he became Assistant to the Director of Public Works. He held that title consistently, but the job's responsibilities did not remain constant. He initially "fill[ed] in the gaps[,] doing whatever work needed to be done." R. 16 at 3. That included inspecting for building-code violations, handling animal-control problems, overseeing streetscaping projects, working on easements, handling citizen requests, and coordinating maintenance.

In 2009, the Department drafted a formal description of Mathis's job. The essential functions of the job included indoor work, such as "answer[ing] calls," "set[ting] up for meetings" and "assist[ing] with garbage fee billing," as well as outdoor work, such as supervising the "[c]ommunity service [program for] felons," "[e]nforc[ing] housing code requirements [by] clean[ing] up yards and remov[ing] vehicles that are inoperable," doing "[b]uilding maintenance," and "[a]ssist[ing] with [i]nspections and permits." R. 16-2 at 60. One of the listed adverse conditions of the job was "[e]xposure to temperature extremes—frequent." *Id.* at 61.

That job description held true until the summer of 2011, when a new Public Works Director gave Mathis more responsibilities for code inspections, a task that required him to spend even more time outside. Mathis's outdoor assignments increased still more in the fall of 2011,

and yet more in January 2012, when his desk was moved from City Hall to the Public Works Garage. In the garage, Mathis could no longer field citizen phone calls or do the administrative work he had done before, and those tasks were reassigned to other employees.

With more outdoor work, a skin condition that Mathis thought to be poison ivy worsened. He sought medical attention. At the end of February 2012, Mathis notified the City that he had been diagnosed with lupus, after which he requested leave under the Family and Medical Leave Act, 29 U.S.C. § 2601. On March 20, Dr. C. Rodney Susong, Mathis's dermatologist, completed the FMLA certification form and described Mathis's diagnosis. Mathis's essential job functions (as described in the employer portion of the FMLA form) were "Community Service Program, Codes Enforcement, Building Maintenance," and Dr. Susong noted that Mathis would be unable to perform his job functions because he "w[ould] need to be indoors" and because he would have to be absent during any flare-ups. R. 11-17 at 2–3.

Mathis took an indefinite leave. During his absence, the Department restructured its workflow. "[T]he Community Service Program went away. A codes enforcement officer was hired. Building maintenance was just folded into the regular day to day operations of Public Works. There was no [longer an] Assistant to the Public Works Director." R. 16-2 at 15. When Mathis was preparing to return to work after six months on leave, he met with the Public Works Director and the City Manager and says he was told that his duties "would be helping with general codes, maintenance and very little sun exposure, just in and out of vehicles." R. 16-3 at 19. But his actual duties turned out to be primarily outdoor work, including weeding, painting, and working on the garbage truck.

Though this outdoor work purportedly exacerbated his medical condition, Mathis did not ask for a change in duties. He instead purchased protective clothing and, after presenting a note

from his doctor, was allowed to wear ultraviolet light-protective shirts rather than the standard department uniform. He initially purchased these shirts himself, but the City eventually offered to pay for them. All of this occurred before May 2013, when Mathis asked the City to "limit the amount of time he is in the sun" and provided a note from Dr. Susong in support of his request. R. 16-2 at 79.

The protective clothing did not keep Mathis's symptoms at bay. In June 2013, he sought a new FMLA certification from human resources, which, at the direction of the Director of Public Works, described Mathis's job's essential functions as weeding and mowing. Dr. Susong completed the form in June, explaining that Mathis "cannot work outside due to lupus. . . . He does wear protective clothing . . . but this may not be sufficient." R. 11-19 at 2. Dr. Susong also said that Mathis "should be fine to work indoors" and "must avoid sunlight." *Id.* at 3. The new city manager, unsure exactly what restrictions Dr. Susong wanted to impose, sent a letter asking for clarification. The letter ended with this question: "Is it your recommendation that Mr. Mathis be limited to working only indoors with no outside work permitted?" R. 11-20 at 1.

Dr. Susong answered: "[M]y simple reply is that he must work only indoors, period. . . . [T]his disease is a lifelong genetic disorder triggered by ultraviolet light. . . . Only God knows whether he can tolerate sun exposure at all or if so how much. I am not willing to risk this disease flaring with sun exposure that can result in significant injuries." R. 11-21 at 1.

That medical opinion left the City with two options: find Mathis some indoor work or lay him off. The City Manager met with the Director of Public Works to figure out whether there was any indoor job for which Mathis was qualified. The two vacant jobs at the time were Administrative Assistant and Garbage Truck Driver. Mathis wasn't qualified for either job, because he lacked the requisite computer skills and a Commercial Driver's License. Because Dr.

Susong told the City that Mathis could not safely perform his current job, and because there were no vacant positions available to Mathis, the City fired him on July 9, 2013.

After exhausting his administrative remedies before the Equal Employment Opportunity Commission, Mathis sued, alleging that the City had violated the Americans with Disabilities Act by firing him, by failing to restore him to the pre-2011 version of his job as Assistant to the Public Works Director (which Mathis now claims would have accommodated his lupus), and by subjecting him to a hostile work environment. *See* 42 U.S.C. § 12101. After the City removed the case to federal court and the parties exchanged written discovery, the district court granted summary judgment to the City.

## II.

Mathis raises two issues on appeal. He claims the City failed to accommodate his disability by refusing to restore him to the early-2011 version of his job, and that it failed to engage in the mandatory interactive process in good faith. We disagree on both counts.

*Reasonable accommodation.* The Americans with Disabilities Act forbids employers from discriminating on the basis of disability. 42 U.S.C. § 12112(a). To establish a prima facie case that the City violated the Act, Mathis must show that "he is disabled and otherwise qualified for the position, either with or without reasonable accommodation." *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). Mathis "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004). As part of that burden, Mathis must show that he "can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Burns v. Coca-Cola Enterps., Inc.*, 222 F.3d 247, 256 (6th Cir. 2000). The short answer is that Mathis cannot clear this hurdle, because Dr. Susong demanded

exclusively indoor work, and even the early-2011 version of Mathis's job involved significant outdoor work.

The longer answer requires us to account for Mathis's arguments. He first contends that the City should have allowed him to occupy the Assistant to the Public Works Director position as it existed "prior to late 2011." Appellant's Br. 38. That proposal fails because the essential functions of that job couldn't have been accomplished inside. Dr. Susong's letter to the City could not have been clearer about Mathis's limitations: "He must work only indoors, period. . . . Only God knows whether he can tolerate sun exposure at all or if so how much." R. 11-21. It was indoor work or no work.

The essential functions of the Assistant to the Public Works Director position required outdoor work. *See Hoskins v. Oakland Cty. Sherriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000). "Evidence of whether a particular function is essential includes but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; [and] (iii) The amount of time spent on the job performing the function." 29 C.F.R. § 1630.2(n)(3).

At least four of the essential functions in the formal job description that the Department drafted in 2009 require outdoor work: supervising "[c]ommunity service [for] felons," "[e]nforc[ing] housing code requirements [by] clean[ing] up yards and remov[ing] vehicles that are inoperable," "[b]uilding maintenance," and "[a]ssist[ing] with [i]nspections and permits." R. 16-2 at 60. Mathis's own testimony and affidavit all confirm that some outdoor work was required to do this work. He told the Tennessee Department of Labor and Workforce Development that, even prior to 2011, he would at times spend four-and-a-half to five hours a day outside. His deposition and his affidavit say the same thing. So do other affidavits that

Mathis submitted at summary judgment. No reasonable jury could conclude that the job Mathis asked for fell within the "only indoors" parameter set by his doctor.

Even though Mathis did not request it, the City considered accommodating Mathis by transferring him to Garbage Truck Driver or Administrative Assistant. The City found that he was not qualified for either job, and Mathis does not challenge the point.

Mathis now claims that limited outdoor exposure with protective clothing would accommodate his condition. But that request cannot be reconciled with what Dr. Susong told the City at the time. The 2013 letter, not an affidavit by Dr. Susong filed *after* the City's motion for summary judgment, defined the City's options for accommodating Mathis. To hold otherwise, and to accept Dr. Susong's after-the-fact characterization of Mathis's limitations, would encourage employers to doubt the necessity of accommodations demanded by doctors until the extent of disability was confirmed by a court. Pushing employees into litigation to prove that an accommodation is necessary would create a significant burden for employers *and* employees. And it would undermine the informal, good faith discussion of accommodation that the Americans with Disabilities Act envisions. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). The City rightly assumed that the parameters established in Dr. Susong's 2013 letter were accurate, and on that basis it properly understood its choice: give Mathis a job with exclusively indoor work or lay him off.

"An employer or other covered entity is not required to reallocate essential functions" to accommodate a disabled employee. 29 C.F.R. § Pt. 1630, App.; *see also Burns*, 222 F.3d at 257; *Hedrick*, 355 F.3d at 457; *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998). Yet Mathis's request to return him to earlier job responsibilities amounts to just that. His essential functions had changed significantly between early 2011 and early 2012—before he was

7

diagnosed and before he reported his disability. Starting in the summer of 2011, Mathis's responsibilities shifted to include more outdoor building and code inspections. The outdoor work increased even more through the fall, and in the winter the City gave Mathis's phone-answering and administrative responsibilities to others and moved him to the Public Works Garage. The Assistant to the Public Works Director position was largely an outdoor job when Mathis discovered and informed the City of his disability. Giving Mathis primarily indoor work, even in March 2012, would have required a significant reshuffling of essential functions within the Department of Public Works—moving some of Mathis's work to others and giving some new functions to Mathis. The Americans with Disabilities Act doesn't require employers to go that far. *See* 29 C.F.R. § Pt. 1630, App.

Mathis's reasonable accommodation claim fails most plainly because the need for an accommodation was not apparent until mid-2013, when his limitations would not have allowed him to perform his desired job's essential functions. But it also appears that no accommodation would have been available even if Mathis had requested one in early 2012, because the job he desired no longer existed. No reasonable jury could find the City liable for failing to provide a reasonable accommodation, because no reasonable accommodation was available.

*Interactive process*. When a disabled employee requests an accommodation, the Act requires employers "to initiate an informal, interactive process with the [employee]" to "determine the appropriate reasonable accommodation." 29 C.F.R. § 1630.2(*o*)(3). Both parties are obliged to engage in the process in good faith. *Kleiber*, 485 F.3d at 871. Mathis claims that the City violated that duty by failing to seek out an accommodation in March 2012, when it first became aware of his condition. We disagree.

As an initial matter, Mathis has not established that a reasonable accommodation was available in 2012 or 2013. "[A] court need not consider whether there has been a failure to engage in the interactive process when a plaintiff fails to meet his burden of showing that a position to accommodate him was vacant." *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 711 (6th Cir. 2015); *see Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001); *Kleiber v. Honda of Am. Mfg., Inc.*, 420 F. Supp. 2d 809, 826 (S.D. Ohio 2006). That reality presents one obstacle to his claim.

There is another. Even assuming that a reasonable accommodation might have been possible in 2012, he cannot claim bad faith in an interactive process that he never initiated. "In general . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." 29 C.F.R. § Pt. 1630, App. The employer's duty to engage in the interactive process arises only after an employee proposes a reasonable accommodation or shows the need for one. *See Burns*, 222 F.3d at 258; *Arthur*, 625 F. App'x at 711.

Mathis argues that his initial FMLA certification also notified the City of the need for an accommodation. But when he told the City of his condition in March 2012, and Dr. Susong indicated that "he will need to be indoors," Appellant's Br. 32, Mathis was not actually asking for any accommodation at work—indoor work, protective clothing, or his early-2011 job. He instead was asking for leave under the FMLA, which the City granted. When he returned to work six months later (at which point his condition may have been significantly better or worse), Mathis did not request a change of duties or a transfer to another position. Before resuming work, Mathis discussed his return with the Public Works Director and agreed to go back to his office in the Public Works Garage, which he knew involved at least some outside work and essential functions different from his position as it existed in early 2011. And when the City

assigned him to the garbage truck and other outdoor work, he did not object. His silence through late 2012 and early 2013 settles the issue. In the absence of a request for an accommodation, the City had no duty to engage in the interactive process.

Mathis handed in a new FMLA form in June 2013. This time, Dr. Susong's description of Mathis's condition, combined with Mathis's prior submission of a doctor's note regarding the need for protective clothing, made clear that an accommodation would be necessary at work regardless of whether Mathis took more leave. The City read the form as notice of the need for an accommodation, then did what the Act requires. The City Manager sought clarification from Dr. Susong in order to understand what work Mathis could safely do. That led to Dr. Susong's emphatic demand that Mathis do no outside work, which in turn left the City with no reasonable options to accommodate him.

For these reasons, we must affirm.