**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0157n.06

Case No. 18-5697

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MATTHEW MARBLE, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Mar 29, 2019 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| STATE OF TENNESSEE, *et al.*, | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| Defendants-Appellees. | ) | |

**O P I N I O N**

BEFORE: BATCHELDER, McKEAGUE, and NALBANDIAN, Circuit Judges.

**McKEAGUE, Circuit Judge.** Under Title II of the Americans with Disabilities Act (ADA) and its implementing regulations, public entities are required to make reasonable modifications in their provision of services to avoid discriminating against disabled individuals. To protect disabled individuals from deprivations based on stereotypes, an individualized inquiry is generally required to determine whether an accommodation is necessary and reasonable under the circumstances. Mathew Marble claims that the Tennessee Department of Children's Services (DCS) failed to conduct such an inquiry when he allegedly requested that his child, H.S., be placed with his relatives. The district court granted summary judgment for DCS, finding that Marble's request to place H.S. with his relatives was not a request for accommodation. Marble appealed, and we AFFIRM.

**I**

Matthew Marble is a Michigan resident who suffers from several disabilities, including Osgood-Schlatter disease; a seizure disorder that causes memory issues; blindness in his left eye; and a history of depression and trauma. Marble's child, H.S., was born in Tennessee in 2012. Marble was present at the birth and signed an acknowledgement of paternity, but he returned to his home in Michigan shortly thereafter. About a year later, based on a referral indicating drug exposure and lack of supervision, DCS removed H.S. from her mother's care and placed her with foster parents in Tennessee.

On September 5, 2013, Marble met with DCS to establish a "permanency plan" for H.S., under which the goal was to return H.S. to the custody of a parent or relative. In order to get custody under the plan, Marble was required to pay support for H.S.'s care, refrain from illegal drugs and alcohol, maintain stable housing for 6 months, establish a legal means of income through employment or benefits, and visit H.S. regularly, among other requirements.

In the fall of 2013, Marble approached Bobbie and Will DuBoise, his aunt and uncle, who also live in Michigan, about the possibility of having H.S. placed with them. The DuBoises agreed and contacted DCS in order to offer their home. The DuBoises then began the process of foster care licensure, as well as locating Michigan doctors to care for H.S. and regularly visiting H.S. in Tennessee to establish a relationship with her. DCS submitted requests to the state of Michigan under the Interstate Compact on the Placement of Children (ICPC) to have Marble and the DuBoises certified to take custody. In July 2014, Michigan authorities denied the request regarding Marble but approved the request regarding the DuBoises.

Once the DuBoises' ICPC request was approved, DCS asked the Tennessee juvenile court to place H.S. with them on a trial basis, but H.S.'s guardian ad litem objected, citing H.S.'s medical

condition and H.S.'s mother's ongoing visitation rights in Tennessee. After an evidentiary hearing, the juvenile court found that it was in H.S.'s best interests to remain with her foster parents in Tennessee. Tennessee courts adjudicated H.S. "dependent and neglected" with respect to Marble and, in a separate proceeding, terminated Marble's parental rights. Both decisions were affirmed by the Tennessee Court of Appeals. *See In re H.S. I*, No. M2015-00842-COA-R3-PT, 2016 WL 3209444, at *11 (Tenn. Ct. App. May 31, 2016); *In re H.S. II*, No. M2016-00387-COA-R3-JV, 2016 WL 7048840, at *8 (Tenn. Ct. App. Dec. 5, 2016).

On May 4, 2014, Marble sued DCS in federal court, alleging discrimination on the basis of disability in violation of Title II of the ADA and Section 504 the Rehabilitation Act of 1973.[1] Marble claimed that DCS refused to accommodate him by transferring custody of H.S. to Marble's relatives and that DCS's failure to conduct an individualized assessment of the effect of Marble's disabilities on his ability to parent H.S. was an independent violation of the ADA.

DCS filed a motion for summary judgment, which the district court granted. The court found that DCS did not violate a duty to conduct an individualized inquiry into Marble's disabilities because there was a "complete absence of proof" that Marble ever requested accommodation or otherwise indicated the need for accommodation to meet the requirements of the permanency plan. On appeal, Marble contests the district court's conclusion, claiming that he requested that DCS accommodate his disabilities by placing H.S. with his relatives.

---

[1] The two provisions are "quite similar in purpose and scope," and we can address the claims in this case in "parallel" because the "differences in the two statutes are not implicated . . . or, indeed, raised by the parties at all." *Tri-Cities Holdings LLC v. Tenn. Admin. Procedures Div.*, 726 F. App'x 298, 307 (6th Cir. 2018) (quoting *McPherson v. MHSAA*, 119 F.3d 453, 459–60 (6th Cir. 1997)). Furthermore, "cases construing one statute are instructive in construing the other." *McPherson*, 119 F.3d at 460 (quoting *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997)).

**II**

We review the district court's grant of summary judgment de novo. *Brumley v. United Parcel Service, Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (citation omitted). Viewing the facts in the light most favorable to Marble, the non-movant, we must determine whether Marble raised a genuine issue of material fact as to whether DCS had a duty to accommodate him and failed to do so. *Id.*; Fed. R. Civ. P. 56(a). Finding none, we affirm the judgment of the district court.

**III**

Enacted in 1990, the ADA provides a "broad mandate" to remedy discrimination against disabled individuals. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). Under the ADA's tripartite structure, Title I covers employment, Title II protects access to public services, and Title III protects access to public accommodations. *See* 42 U.S.C. §§ 12112, 12132, 12182.

Title II states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. The statute defines "public entity" as any state or local government, including departments and agencies. *Id.* § 12131(1)(A)–(B). The term "services, programs, or activities" has been construed broadly, capturing "virtually everything that a public entity does." *Babcock v. Michigan*, 812 F.3d 531, 540 (6th Cir. 2016) (quotation omitted). Although the text of Title II does not define "discrimination," we have generally recognized two methods for proving discrimination: intentional discrimination and failure to make reasonable accommodation. *McPherson v. MHSAA*, 119 F.3d 453, 460 (6th Cir. 1997). The latter method stems from a regulation implementing Title II:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7)(i); *see also Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749–50 (2017). This regulation approximates the statutory definitions of "discrimination" in Titles I and III. *See* 42 U.S.C. §§ 12112(b)(5)(A), 12182(b)(2)(A)(ii).

In this appeal, the parties do not dispute that Marble is disabled for purposes of the ADA or that DCS is a public entity that provided services to Marble. The dispute centers on whether DCS discriminated against Marble by failing to conduct an individualized inquiry into Marble's disabilities and reasonable accommodations.

The principles that govern this appeal are drawn mainly from cases under Title I, along with the Supreme Court's opinion in *PGA Tour* under Title III. *See* 532 U.S. at 676. We turn to these cases because we have had fewer opportunities to address reasonable-accommodation claims under Title II, as we have before noted: "Not surprisingly, most of the law that has been made in ADA cases has arisen in the context of employment discrimination claims, but we have no doubt that the decisional principles of these cases may be applied to this case." *McPherson*, 119 F.3d at 460. Since *McPherson*, we have occasionally relied on Title I cases, though without drawing attention to the practice. *See, e.g.*, *Mbawe v. Ferris State Univ.*, 751 F. App'x 832, 840 (6th Cir. 2018) (citing *EEOC v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015)), *petition for cert. filed*, Docket No. 18-1179 (U.S. March 12, 2019); *Buescher v. Baldwin Wallace Univ.*, 86 F. Supp. 3d 789, 806 (N.D. Ohio 2015) (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042 (6th Cir. 1998)). Other circuits have likewise relied on cases from Titles I and III to inform Title II cases. *See, e.g.*, *McElwee v. County of Orange*, 700 F.3d 635, 640 n.2 (2nd Cir. 2012). Because there

are differences among the provisions and implementing regulations of Titles I, II, and III, however, we take the time to discuss the extent to which the principles derived from Titles I and III should apply to Marble's case.

The first principle is that the ADA requires individualized inquiry in response to a request for accommodation. Under the ADA, it is a "basic requirement that the need of a disabled person be evaluated on an individual basis." *PGA Tour*, 532 U.S. at 690. The purpose of an individualized approach is to protect disabled individuals "from deprivations based on prejudice, stereotypes, or unfounded fear," *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 287 (1987), and to obviate the need for "courts and employers to speculate about a person's condition . . . based on general information." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999). Therefore, an individualized inquiry is required to determine whether a person has a disability for purposes of the ADA. *Id.* An individualized inquiry is also required to determine whether an accommodation would be "reasonable under the circumstances as well as necessary for that person." *PGA Tour*, 532 U.S. at 688.

Although *PGA Tour* is a Title III case, the Supreme Court's reasoning makes clear that the individualized inquiry requirement also applies to requests for accommodation under Title II. The Court found that an individualized inquiry was required under Title III because (1) the purpose of the ADA is to eliminate discrimination against "individuals," 42 U.S.C. § 12101(b)(1); (2) Title III requires reasonable modifications on behalf of "individuals," *Id.* § 12182(b)(2)(A)(ii); and (3) the legislative history of Title III indicates that decisions should be made "on facts applicable to individuals," S. Rep. No. 101-116, at 60–61 (1989). *PGA Tour*, 532 U.S. at 688. Those three reasons also obtain for Title II: (1) the ADA protects "individuals," 42 U.S.C. § 12101(b)(1); (2) Title II requires reasonable modifications for "individuals," 28 C.F.R. §§ 35.130(a), (b)(7)(i); and

(3) the legislative history of Title II states that "[t]he forms of discrimination prohibited by [Title II] are comparable to those set out in the applicable provisions of [T]itles I and III," S. Rep. No. 101-116, at 44 (1989). Therefore, when a disabled individual requests accommodation under Title II, the covered entity must give "individualized attention" to that request. *See PGA Tour*, 532 U.S. at 691; *see also Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 77–78 (2d Cir. 2016).

The second principle is that a covered entity is generally not liable for failing to make reasonable accommodation if the plaintiff did not request accommodation or otherwise alert the covered entity to the need for accommodation. *See Gantt*, 143 F.3d at 1046–47 ("[In general] . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." (quoting 29 C.F.R. pt. 1630 App. § 1630.9)).[2] The reason for placing this "initial burden" on the employee is so that "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Id.* In requesting accommodation, an employee "need not use the magic words 'accommodation' or even 'disability.'" *Leeds v. Potter*, 249 F. App'x 442, 449–50 (6th Cir. 2017) (citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)). But the "context" of the request must be clear enough that the employer can infer that the purpose of a request for a particular benefit is to accommodate "medical restrictions." *Smith*, 376 F.3d at 535. We have held, for instance, that an employee making a request for leave under the Family Medical Leave Act did not trigger an employer's duty under the ADA because the employee was not requesting any particular

---

[2] Depending on circumstances, this rule of thumb may not be absolute. *See McCoy v. Texas Dept. of Crim. Justice*, C.A. No. C-05-370, 2006 WL 2331055, at *7 (S.D. Texas Aug. 9, 2006) (collecting cases showing that a covered entity may need to proactively institute accommodations where the need for accommodation is "obvious").

accommodation from his employer. *See Mathis v. City of Red Bank*, 657 F. App'x 557, 563 (6th Cir. 2016).[3]

In translating this proposition to Marble's case under Title II, we note that our sister circuits have found it helpful to consider the extent to which the relationship between the individual and the covered entity is analogous to the relationship between an employee and an employer. *See McElwee*, 700 F.3d at 640 n.2 (citing *Bauer v. Muscular Dystrophy Ass'n, Inc.*, 427 F.3d 1326, 1333 (10th Cir. 2005)). In this case, Marble lived in Michigan, a few hundred miles from Tennessee, and while Marble and DCS maintained contact, Marble's relationship with DCS was less consistent and intimate than a typical employment relationship. Therefore, DCS would be in a poor position to speculate as to Marble's need or desire for accommodation, and it makes sense to apply the principle that Marble had the initial burden of requesting accommodation.

**IV**

Marble argues that he requested accommodation for his disabilities when he allegedly asked DCS to place H.S. with his aunt and uncle, and that DCS failed to conduct an individualized inquiry in addressing that request. The district court rejected Marble's claim, finding that Marble never actually requested accommodation. We affirm the district court's decision because we agree that the request to place H.S. with Marble's relatives was not a request for accommodation and because, in any case, DCS did not actually reject Marble's request, rather, implementation was blocked by the juvenile court.

---

[3] Some Title I cases reference the "interactive process," a term that derives from Title I's implementing regulations. *See* 29 C.F.R. § 1630.2(o)(3). This term is a name for the individualized inquiry required in the employment context—"[t]he individualized inquiry is an 'interactive process.'" *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014). Because Marble's case arises under Title II, we use the more general term "individualized inquiry."

It does not strike us as unreasonable that placement of Marble's child with his relatives, by which Marble might maintain his relationship with the child, could serve as an accommodation for Marble's disabilities if those disabilities prevented him from taking sole custody.[4] But to trigger DCS's duty to conduct an individualized inquiry into Marble's disabilities and the reasonableness of that accommodation, Marble's request needed to alert DCS to the fact that the purpose of the request was in fact to accommodate his disabilities. *See Leeds*, 249 F. App'x at 450 (citing *Smith*, 376 F.3d at 535). It is true that a disabled individual is not required to use the specific words "disability" or "accommodation," and a covered entity may need to infer that a request is a request for accommodation if "context" shows that it is meant to compensate for medical restrictions. *Id.* But DCS could not have known from context that this request was a request for accommodation for three reasons: (1) the request came from Marble's aunt rather than Marble, (2) Marble testified that he could not recall requesting accommodation and had not even considered whether his disabilities were keeping him from meeting the requirements of the permanency plan, and (3) placement with a relative was already encouraged by Tennessee law and H.S.'s permanency plan.

First, the record shows that the request came from Marble's aunt, Bobbi DuBoise, rather than from Marble himself, which makes it difficult to conclude that DCS should have connected the dots between the request and Marble's rights under the ADA. DuBoise's affidavit states that Marble approached her and her husband to ask if they would take custody of H.S. The district court likewise noted that Marble went to his aunt, not to DCS. DuBoise stated that she called DCS

---

[4] In a 2015 letter regarding another case, the Department of Justice and the Department of Health and Human Services advocated for a similar accommodation under Title II. *See* DJ No. 204-36-216 or HHS No. 14-182176. The letter faults the Massachusetts Department of Children and Families for removing a child from a disabled woman's care shortly after birth based on "assumptions and stereotypes" about her mental disability, for rejecting a family-supported parenting plan, and for attempting to terminate her parental rights on the basis of her disability.

caseworker Lindsey Kenyon to inform her that her home was available for relative placement. DuBoise then traveled to one of Marble's meetings with DCS and advised DCS that she and her husband would be willing to care for H.S. Marble's complaint confirms that Marble's aunt approached DCS herself in the fall and winter of 2013. Although Marble was in favor of having his aunt care for H.S., the record does not indicate that Marble himself made the request, that Marble asked his aunt to act on his behalf, or that Marble or DuBoise ever connected DuBoise's intervention to Marble's disabilities.

Second, as the district court observed, Marble's testimony shows that he never told DCS his disabilities kept him from meeting the requirements of the permanency plan. During Marble's deposition, counsel for DCS asked Marble whether he ever alerted DCS that a disability was hindering him from following the permanency plan. For each disability, Marble answered that he could not recall communicating anything to that effect.[5] In fact, Marble's testimony shows that he did not conceive of the possibility that his disabilities might be keeping him from meeting the requirements of the permanency plan:

Q. Did you ever ask DCS to accommodate your disabilities?
A. Not that I remember.
Q. Did you believe that your disabilities were preventing you from doing what DCS wanted you to do?
A. I never really put thought into it.

R. 98-2, PID 927. Therefore, even assuming Marble's aunt made the request on Marble's behalf rather than for herself or H.S., the request to place H.S. with the DuBoises could not have been

---

[5] Marble did testify that he told DCS that he had trouble reading, but he did not specify which, if any, requirement of the permanency plan was affected by his partial blindness. As for reading the permanency plan itself, Marble testified that DCS employees provided "quite a bit of help" in understanding the documents.

intended to accommodate Marble's disabilities because he did not perceive his disabilities as the obstacle between him and custody of H.S.

Finally, placing H.S. with a relative was encouraged by law and by H.S.'s permanency plan, so DCS would not have seen the intervention of a relative as a request for accommodation by Marble under the ADA. Under Tennessee law, "[the permanency] plan shall include a goal for each child of . . . (ii) Permanent placement of the child with a fit and willing relative or relatives of the child." T.C.A. § 37-2-403(a)(1)(A). And, "[w]hen a child has been removed from such child's home . . . the department shall attempt to place the child with a relative for kinship foster care." T.C.A. § 37-2-414(b)(2). The permanency plan developed for H.S. conformed with Tennessee law by listing "Permanency Goal: Exit Custody with Relative." Therefore, the normalcy of a relative stepping forward to take custody of H.S. would not have alerted DCS to the fact that the intervention was actually a request for accommodation on Marble's behalf.

For these reasons, we find that Marble did not raise a genuine issue of fact as to whether he requested accommodation for his disabilities, so DCS is not liable for any failure to conduct an individualized inquiry into Marble's disabilities and the possibility of accommodation.

Furthermore, the purpose of the individualized inquiry is to protect disabled persons "from deprivations based on prejudice, stereotypes, or unfounded fear." *Arline*, 480 U.S. at 287. Even if we did find that Marble requested an accommodation, DCS is not liable for failing to conduct an individualized inquiry before rejecting the request because DCS did not reject the request or "deprive" Marble—rather, it attempted to implement the request by asking the juvenile court to place H.S. with the DuBoises. After a hearing, the court determined that relocating H.S. to Michigan would not be "in the best interest of the child." Under Tennessee law, the mission of DCS is first "to further the best interest of the child." T.C.A. § 37-5-102(a). Therefore, even if

DCS could flout the court's decision (a point the parties disputed below), acting against the best interest of H.S. would have been a "fundamental alteration" of the nature of DCS's services, so denying such a request cannot form the basis for liability. *See* 28 C.F.R. § 35.130(b)(7)(i); *PGA Tour*, 532 U.S. at 688.

V

DCS also argued below that it was a state agency immune from suit under the Eleventh Amendment. Congress has the power to abrogate the Eleventh Amendment to enforce the provisions of the Fourteenth Amendment, and the ADA is expressly intended to do so, though the scope of Congress' "prophylactic" enforcement powers is contested. *See Tennessee v. Lane*, 541 U.S. 509, 517–18 (2004); 42 U.S.C. § 12202; *United States v. Georgia*, 546 U.S. 151, 158–59 (2006). If there were a genuine issue of fact as to whether DCS's conduct violated Title II, the district court would need to determine whether DCS's conduct also violated the Fourteenth Amendment, or, even if it did not, whether Congress had validly, prophylactically abrogated sovereign immunity for that class of conduct. *Georgia*, 546 U.S. at 159. Because we agree with the district court that Marble does not raise a genuine issue of fact as to whether DCS's conduct violated Title II, Marble's suit would indeed be barred by sovereign immunity. *See Babcock*, 812 F.3d at 539.

VI

For these reasons, we affirm the district court's grant of summary judgment to DCS.