NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
 File Name: 19a0157n.06

 Case No. 18-5697

 UNITED STATES COURT OF APPEALS
 FOR THE SIXTH CIRCUIT

 FILED
MATTHEW MARBLE, ) Mar 29, 2019
 ) DEBORAH S. HUNT, Clerk
 Plaintiff-Appellant, )
 ) ON APPEAL FROM THE
v. ) UNITED STATES DISTRICT
 ) COURT FOR THE MIDDLE
STATE OF TENNESSEE, et al., ) DISTRICT OF TENNESSEE
 )
 Defendants-Appellees. )

 OPINION

BEFORE: BATCHELDER, McKEAGUE, and NALBANDIAN, Circuit Judges.

 McKEAGUE, Circuit Judge. Under Title II of the Americans with Disabilities Act

(ADA) and its implementing regulations, public entities are required to make reasonable

modifications in their provision of services to avoid discriminating against disabled individuals.

To protect disabled individuals from deprivations based on stereotypes, an individualized inquiry

is generally required to determine whether an accommodation is necessary and reasonable under

the circumstances. Mathew Marble claims that the Tennessee Department of Children’s Services

(DCS) failed to conduct such an inquiry when he allegedly requested that his child, H.S., be placed

with his relatives. The district court granted summary judgment for DCS, finding that Marble’s

request to place H.S. with his relatives was not a request for accommodation. Marble appealed,

and we AFFIRM.
Case No. 18-5697, Marble v. Tenn., et al.

 I

 Matthew Marble is a Michigan resident who suffers from several disabilities, including

Osgood-Schlatter disease; a seizure disorder that causes memory issues; blindness in his left eye;

and a history of depression and trauma. Marble’s child, H.S., was born in Tennessee in 2012.

Marble was present at the birth and signed an acknowledgement of paternity, but he returned to

his home in Michigan shortly thereafter. About a year later, based on a referral indicating drug

exposure and lack of supervision, DCS removed H.S. from her mother’s care and placed her with

foster parents in Tennessee.

 On September 5, 2013, Marble met with DCS to establish a “permanency plan” for H.S.,

under which the goal was to return H.S. to the custody of a parent or relative. In order to get

custody under the plan, Marble was required to pay support for H.S.’s care, refrain from illegal

drugs and alcohol, maintain stable housing for 6 months, establish a legal means of income through

employment or benefits, and visit H.S. regularly, among other requirements.

 In the fall of 2013, Marble approached Bobbie and Will DuBoise, his aunt and uncle, who

also live in Michigan, about the possibility of having H.S. placed with them. The DuBoises agreed

and contacted DCS in order to offer their home. The DuBoises then began the process of foster

care licensure, as well as locating Michigan doctors to care for H.S. and regularly visiting H.S. in

Tennessee to establish a relationship with her. DCS submitted requests to the state of Michigan

under the Interstate Compact on the Placement of Children (ICPC) to have Marble and the

DuBoises certified to take custody. In July 2014, Michigan authorities denied the request

regarding Marble but approved the request regarding the DuBoises.

 Once the DuBoises’ ICPC request was approved, DCS asked the Tennessee juvenile court

to place H.S. with them on a trial basis, but H.S.’s guardian ad litem objected, citing H.S.’s medical

 -2-
Case No. 18-5697, Marble v. Tenn., et al.

condition and H.S.’s mother’s ongoing visitation rights in Tennessee. After an evidentiary hearing,

the juvenile court found that it was in H.S.’s best interests to remain with her foster parents in

Tennessee. Tennessee courts adjudicated H.S. “dependent and neglected” with respect to Marble

and, in a separate proceeding, terminated Marble’s parental rights. Both decisions were affirmed

by the Tennessee Court of Appeals. See In re H.S. I, No. M2015-00842-COA-R3-PT, 2016 WL

3209444, at *11 (Tenn. Ct. App. May 31, 2016); In re H.S. II, No. M2016-00387-COA-R3-JV,

2016 WL 7048840, at *8 (Tenn. Ct. App. Dec. 5, 2016).

 On May 4, 2014, Marble sued DCS in federal court, alleging discrimination on the basis

of disability in violation of Title II of the ADA and Section 504 the Rehabilitation Act of 1973.1

Marble claimed that DCS refused to accommodate him by transferring custody of H.S. to Marble’s

relatives and that DCS’s failure to conduct an individualized assessment of the effect of Marble’s

disabilities on his ability to parent H.S. was an independent violation of the ADA.

 DCS filed a motion for summary judgment, which the district court granted. The court

found that DCS did not violate a duty to conduct an individualized inquiry into Marble’s

disabilities because there was a “complete absence of proof” that Marble ever requested

accommodation or otherwise indicated the need for accommodation to meet the requirements of

the permanency plan. On appeal, Marble contests the district court’s conclusion, claiming that he

requested that DCS accommodate his disabilities by placing H.S. with his relatives.

1
 The two provisions are “quite similar in purpose and scope,” and we can address the claims in
this case in “parallel” because the “differences in the two statutes are not implicated . . . or, indeed,
raised by the parties at all.” Tri-Cities Holdings LLC v. Tenn. Admin. Procedures Div., 726 F.
App’x 298, 307 (6th Cir. 2018) (quoting McPherson v. MHSAA, 119 F.3d 453, 459–60 (6th Cir.
1997)). Furthermore, “cases construing one statute are instructive in construing the other.”
McPherson, 119 F.3d at 460 (quoting Andrews v. Ohio, 104 F.3d 803, 807 (6th Cir. 1997)).
 -3-
Case No. 18-5697, Marble v. Tenn., et al.

 II

 We review the district court’s grant of summary judgment de novo. Brumley v. United

Parcel Service, Inc., 909 F.3d 834, 839 (6th Cir. 2018) (citation omitted). Viewing the facts in the

light most favorable to Marble, the non-movant, we must determine whether Marble raised a

genuine issue of material fact as to whether DCS had a duty to accommodate him and failed to do

so. Id.; Fed. R. Civ. P. 56(a). Finding none, we affirm the judgment of the district court.

 III

 Enacted in 1990, the ADA provides a “broad mandate” to remedy discrimination against

disabled individuals. PGA Tour, Inc. v. Martin, 532 U.S. 661, 675 (2001). Under the ADA’s

tripartite structure, Title I covers employment, Title II protects access to public services, and

Title III protects access to public accommodations. See 42 U.S.C. §§ 12112, 12132, 12182.

 Title II states that “no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity.” Id. § 12132.

The statute defines “public entity” as any state or local government, including departments and

agencies. Id. § 12131(1)(A)–(B). The term “services, programs, or activities” has been construed

broadly, capturing “virtually everything that a public entity does.” Babcock v. Michigan, 812 F.3d

531, 540 (6th Cir. 2016) (quotation omitted). Although the text of Title II does not define

“discrimination,” we have generally recognized two methods for proving discrimination:

intentional discrimination and failure to make reasonable accommodation. McPherson v. MHSAA,

119 F.3d 453, 460 (6th Cir. 1997). The latter method stems from a regulation implementing

Title II:

 -4-
Case No. 18-5697, Marble v. Tenn., et al.

 A public entity shall make reasonable modifications in policies, practices, or
 procedures when the modifications are necessary to avoid discrimination on the
 basis of disability, unless the public entity can demonstrate that making the
 modifications would fundamentally alter the nature of the service, program, or
 activity.

28 C.F.R. § 35.130(b)(7)(i); see also Fry v. Napoleon Cmty. Schs., 137 S. Ct. 743, 749–50 (2017).

This regulation approximates the statutory definitions of “discrimination” in Titles I and III. See

42 U.S.C. §§ 12112(b)(5)(A), 12182(b)(2)(A)(ii).

 In this appeal, the parties do not dispute that Marble is disabled for purposes of the ADA

or that DCS is a public entity that provided services to Marble. The dispute centers on whether

DCS discriminated against Marble by failing to conduct an individualized inquiry into Marble’s

disabilities and reasonable accommodations.

 The principles that govern this appeal are drawn mainly from cases under Title I, along

with the Supreme Court’s opinion in PGA Tour under Title III. See 532 U.S. at 676. We turn to

these cases because we have had fewer opportunities to address reasonable-accommodation claims

under Title II, as we have before noted: “Not surprisingly, most of the law that has been made in

ADA cases has arisen in the context of employment discrimination claims, but we have no doubt

that the decisional principles of these cases may be applied to this case.” McPherson, 119 F.3d at

460. Since McPherson, we have occasionally relied on Title I cases, though without drawing

attention to the practice. See, e.g., Mbawe v. Ferris State Univ., 751 F. App’x 832, 840 (6th Cir.

2018) (citing EEOC v. Ford Motor Co., 782 F.3d 753, 766 (6th Cir. 2015)), petition for cert. filed,

Docket No. 18-1179 (U.S. March 12, 2019); Buescher v. Baldwin Wallace Univ., 86 F. Supp. 3d

789, 806 (N.D. Ohio 2015) (citing Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042 (6th Cir.

1998)). Other circuits have likewise relied on cases from Titles I and III to inform Title II cases.

See, e.g., McElwee v. County of Orange, 700 F.3d 635, 640 n.2 (2nd Cir. 2012). Because there

 -5-
Case No. 18-5697, Marble v. Tenn., et al.

are differences among the provisions and implementing regulations of Titles I, II, and III, however,

we take the time to discuss the extent to which the principles derived from Titles I and III should

apply to Marble’s case.

 The first principle is that the ADA requires individualized inquiry in response to a request

for accommodation. Under the ADA, it is a “basic requirement that the need of a disabled person

be evaluated on an individual basis.” PGA Tour, 532 U.S. at 690. The purpose of an individualized

approach is to protect disabled individuals “from deprivations based on prejudice, stereotypes, or

unfounded fear,” Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 287 (1987), and to obviate the

need for “courts and employers to speculate about a person’s condition . . . based on general

information.” Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999). Therefore, an

individualized inquiry is required to determine whether a person has a disability for purposes of

the ADA. Id. An individualized inquiry is also required to determine whether an accommodation

would be “reasonable under the circumstances as well as necessary for that person.” PGA Tour,

532 U.S. at 688.

 Although PGA Tour is a Title III case, the Supreme Court’s reasoning makes clear that the

individualized inquiry requirement also applies to requests for accommodation under Title II. The

Court found that an individualized inquiry was required under Title III because (1) the purpose of

the ADA is to eliminate discrimination against “individuals,” 42 U.S.C. § 12101(b)(1); (2) Title

III requires reasonable modifications on behalf of “individuals,” Id. § 12182(b)(2)(A)(ii); and (3)

the legislative history of Title III indicates that decisions should be made “on facts applicable to

individuals,” S. Rep. No. 101-116, at 60–61 (1989). PGA Tour, 532 U.S. at 688. Those three

reasons also obtain for Title II: (1) the ADA protects “individuals,” 42 U.S.C. § 12101(b)(1); (2)

Title II requires reasonable modifications for “individuals,” 28 C.F.R. §§ 35.130(a), (b)(7)(i); and

 -6-
Case No. 18-5697, Marble v. Tenn., et al.

(3) the legislative history of Title II states that “[t]he forms of discrimination prohibited by

[Title II] are comparable to those set out in the applicable provisions of [T]itles I and III,” S. Rep.

No. 101-116, at 44 (1989). Therefore, when a disabled individual requests accommodation under

Title II, the covered entity must give “individualized attention” to that request. See PGA Tour,

532 U.S. at 691; see also Wright v. New York State Dep’t of Corr., 831 F.3d 64, 77–78 (2d Cir.

2016).

 The second principle is that a covered entity is generally not liable for failing to make

reasonable accommodation if the plaintiff did not request accommodation or otherwise alert the

covered entity to the need for accommodation. See Gantt, 143 F.3d at 1046–47 (“[In general]

. . . it is the responsibility of the individual with a disability to inform the employer that an

accommodation is needed.” (quoting 29 C.F.R. pt. 1630 App. § 1630.9)).2 The reason for placing

this “initial burden” on the employee is so that “[t]he employer is not required to speculate as to

the extent of the employee’s disability or the employee’s need or desire for an accommodation.”

Id. In requesting accommodation, an employee “need not use the magic words ‘accommodation’

or even ‘disability.’” Leeds v. Potter, 249 F. App’x 442, 449–50 (6th Cir. 2017) (citing Smith v.

Henderson, 376 F.3d 529, 535 (6th Cir. 2004)). But the “context” of the request must be clear

enough that the employer can infer that the purpose of a request for a particular benefit is to

accommodate “medical restrictions.” Smith, 376 F.3d at 535. We have held, for instance, that an

employee making a request for leave under the Family Medical Leave Act did not trigger an

employer’s duty under the ADA because the employee was not requesting any particular

2
 Depending on circumstances, this rule of thumb may not be absolute. See McCoy v. Texas Dept.
of Crim. Justice, C.A. No. C-05-370, 2006 WL 2331055, at *7 (S.D. Texas Aug. 9, 2006)
(collecting cases showing that a covered entity may need to proactively institute accommodations
where the need for accommodation is “obvious”).
 -7-
Case No. 18-5697, Marble v. Tenn., et al.

accommodation from his employer. See Mathis v. City of Red Bank, 657 F. App’x 557, 563 (6th

Cir. 2016).3

 In translating this proposition to Marble’s case under Title II, we note that our sister circuits

have found it helpful to consider the extent to which the relationship between the individual and

the covered entity is analogous to the relationship between an employee and an employer. See

McElwee, 700 F.3d at 640 n.2 (citing Bauer v. Muscular Dystrophy Ass’n, Inc., 427 F.3d 1326,

1333 (10th Cir. 2005)). In this case, Marble lived in Michigan, a few hundred miles from

Tennessee, and while Marble and DCS maintained contact, Marble’s relationship with DCS was

less consistent and intimate than a typical employment relationship. Therefore, DCS would be in

a poor position to speculate as to Marble’s need or desire for accommodation, and it makes sense

to apply the principle that Marble had the initial burden of requesting accommodation.

 IV

 Marble argues that he requested accommodation for his disabilities when he allegedly

asked DCS to place H.S. with his aunt and uncle, and that DCS failed to conduct an individualized

inquiry in addressing that request. The district court rejected Marble’s claim, finding that Marble

never actually requested accommodation. We affirm the district court’s decision because we agree

that the request to place H.S. with Marble’s relatives was not a request for accommodation and

because, in any case, DCS did not actually reject Marble’s request, rather, implementation was

blocked by the juvenile court.

3
 Some Title I cases reference the “interactive process,” a term that derives from Title I’s
implementing regulations. See 29 C.F.R. § 1630.2(o)(3). This term is a name for the
individualized inquiry required in the employment context—“[t]he individualized inquiry is an
‘interactive process.’” Rorrer v. City of Stow, 743 F.3d 1025, 1040 (6th Cir. 2014). Because
Marble’s case arises under Title II, we use the more general term “individualized inquiry.”
 -8-
Case No. 18-5697, Marble v. Tenn., et al.

 It does not strike us as unreasonable that placement of Marble’s child with his relatives, by

which Marble might maintain his relationship with the child, could serve as an accommodation for

Marble’s disabilities if those disabilities prevented him from taking sole custody.4 But to trigger

DCS’s duty to conduct an individualized inquiry into Marble’s disabilities and the reasonableness

of that accommodation, Marble’s request needed to alert DCS to the fact that the purpose of the

request was in fact to accommodate his disabilities. See Leeds, 249 F. App’x at 450 (citing Smith,

376 F.3d at 535). It is true that a disabled individual is not required to use the specific words

“disability” or “accommodation,” and a covered entity may need to infer that a request is a request

for accommodation if “context” shows that it is meant to compensate for medical restrictions. Id.

But DCS could not have known from context that this request was a request for accommodation

for three reasons: (1) the request came from Marble’s aunt rather than Marble, (2) Marble testified

that he could not recall requesting accommodation and had not even considered whether his

disabilities were keeping him from meeting the requirements of the permanency plan, and (3)

placement with a relative was already encouraged by Tennessee law and H.S.’s permanency plan.

 First, the record shows that the request came from Marble’s aunt, Bobbi DuBoise, rather

than from Marble himself, which makes it difficult to conclude that DCS should have connected

the dots between the request and Marble’s rights under the ADA. DuBoise’s affidavit states that

Marble approached her and her husband to ask if they would take custody of H.S. The district

court likewise noted that Marble went to his aunt, not to DCS. DuBoise stated that she called DCS

4
 In a 2015 letter regarding another case, the Department of Justice and the Department of Health
and Human Services advocated for a similar accommodation under Title II. See DJ No. 204-36-
216 or HHS No. 14-182176. The letter faults the Massachusetts Department of Children and
Families for removing a child from a disabled woman’s care shortly after birth based on
“assumptions and stereotypes” about her mental disability, for rejecting a family-supported
parenting plan, and for attempting to terminate her parental rights on the basis of her disability.
 -9-
Case No. 18-5697, Marble v. Tenn., et al.

caseworker Lindsey Kenyon to inform her that her home was available for relative placement.

DuBoise then traveled to one of Marble’s meetings with DCS and advised DCS that she and her

husband would be willing to care for H.S. Marble’s complaint confirms that Marble’s aunt

approached DCS herself in the fall and winter of 2013. Although Marble was in favor of having

his aunt care for H.S., the record does not indicate that Marble himself made the request, that

Marble asked his aunt to act on his behalf, or that Marble or DuBoise ever connected DuBoise’s

intervention to Marble’s disabilities.

 Second, as the district court observed, Marble’s testimony shows that he never told DCS

his disabilities kept him from meeting the requirements of the permanency plan. During Marble’s

deposition, counsel for DCS asked Marble whether he ever alerted DCS that a disability was

hindering him from following the permanency plan. For each disability, Marble answered that he

could not recall communicating anything to that effect.5 In fact, Marble’s testimony shows that he

did not conceive of the possibility that his disabilities might be keeping him from meeting the

requirements of the permanency plan:

 Q. Did you ever ask DCS to accommodate your disabilities?
 A. Not that I remember.
 Q. Did you believe that your disabilities were preventing you from doing what
 DCS wanted you to do?
 A. I never really put thought into it.

R. 98-2, PID 927. Therefore, even assuming Marble’s aunt made the request on Marble’s behalf

rather than for herself or H.S., the request to place H.S. with the DuBoises could not have been

5
 Marble did testify that he told DCS that he had trouble reading, but he did not specify which, if
any, requirement of the permanency plan was affected by his partial blindness. As for reading the
permanency plan itself, Marble testified that DCS employees provided “quite a bit of help” in
understanding the documents.
 - 10 -
Case No. 18-5697, Marble v. Tenn., et al.

intended to accommodate Marble’s disabilities because he did not perceive his disabilities as the

obstacle between him and custody of H.S.

 Finally, placing H.S. with a relative was encouraged by law and by H.S.’s permanency

plan, so DCS would not have seen the intervention of a relative as a request for accommodation

by Marble under the ADA. Under Tennessee law, “[the permanency] plan shall include a goal for

each child of . . . (ii) Permanent placement of the child with a fit and willing relative or relatives

of the child.” T.C.A. § 37-2-403(a)(1)(A). And, “[w]hen a child has been removed from such

child’s home . . . the department shall attempt to place the child with a relative for kinship foster

care.” T.C.A. § 37-2-414(b)(2). The permanency plan developed for H.S. conformed with

Tennessee law by listing “Permanency Goal: Exit Custody with Relative.” Therefore, the

normalcy of a relative stepping forward to take custody of H.S. would not have alerted DCS to the

fact that the intervention was actually a request for accommodation on Marble’s behalf.

 For these reasons, we find that Marble did not raise a genuine issue of fact as to whether

he requested accommodation for his disabilities, so DCS is not liable for any failure to conduct an

individualized inquiry into Marble’s disabilities and the possibility of accommodation.

 Furthermore, the purpose of the individualized inquiry is to protect disabled persons “from

deprivations based on prejudice, stereotypes, or unfounded fear.” Arline, 480 U.S. at 287. Even

if we did find that Marble requested an accommodation, DCS is not liable for failing to conduct

an individualized inquiry before rejecting the request because DCS did not reject the request or

“deprive” Marble—rather, it attempted to implement the request by asking the juvenile court to

place H.S. with the DuBoises. After a hearing, the court determined that relocating H.S. to

Michigan would not be “in the best interest of the child.” Under Tennessee law, the mission of

DCS is first “to further the best interest of the child.” T.C.A. § 37-5-102(a). Therefore, even if

 - 11 -
Case No. 18-5697, Marble v. Tenn., et al.

DCS could flout the court’s decision (a point the parties disputed below), acting against the best

interest of H.S. would have been a “fundamental alteration” of the nature of DCS’s services, so

denying such a request cannot form the basis for liability. See 28 C.F.R. § 35.130(b)(7)(i); PGA

Tour, 532 U.S. at 688.

 V

 DCS also argued below that it was a state agency immune from suit under the Eleventh

Amendment. Congress has the power to abrogate the Eleventh Amendment to enforce the

provisions of the Fourteenth Amendment, and the ADA is expressly intended to do so, though the

scope of Congress’ “prophylactic” enforcement powers is contested. See Tennessee v. Lane, 541

U.S. 509, 517–18 (2004); 42 U.S.C. § 12202; United States v. Georgia, 546 U.S. 151, 158–59

(2006). If there were a genuine issue of fact as to whether DCS’s conduct violated Title II, the

district court would need to determine whether DCS’s conduct also violated the Fourteenth

Amendment, or, even if it did not, whether Congress had validly, prophylactically abrogated

sovereign immunity for that class of conduct. Georgia, 546 U.S. at 159. Because we agree with

the district court that Marble does not raise a genuine issue of fact as to whether DCS’s conduct

violated Title II, Marble’s suit would indeed be barred by sovereign immunity. See Babcock,

812 F.3d at 539.

 VI

 For these reasons, we affirm the district court’s grant of summary judgment to DCS.

 - 12 -