RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0228P (6th Cir.)
File Name: 04a0228p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MARY CHRISTINE SMITH,
     *Plaintiff-Appellant,*

    *v.*          No. 02-6073

WILLIAM J. HENDERSON,
Postmaster General, United
States Postal Service,
    *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 00-00515—Charles R. Simpson, III, District Judge.

Argued: January 27, 2004

Decided and Filed: July 15, 2004

Before: SUHRHEINRICH, CLAY, and SUTTON, Circuit
Judges.

_____

### COUNSEL

**ARGUED:** Karen L. Stewart, LAW OFFICE OF KAREN L.
STEWART, Louisville, Kentucky, for Appellant. Candace G.

Hill, ASSISTANT UNITED STATES ATTORNEY,
Louisville, Kentucky, for Appellee. **ON BRIEF:** Karen L.
Stewart, LAW OFFICE OF KAREN L. STEWART,
Louisville, Kentucky, for Appellant. Candace G. Hill, Terry
M. Cushing, ASSISTANT UNITED STATES ATTORNEY,
Louisville, Kentucky, for Appellee.

_____

### OPINION

_____

CLAY, Circuit Judge. Plaintiff Mary Christine Smith
appeals the August 1, 2002, order of the United States District
Court for the Western District of Kentucky, granting
Defendant United States Postal Service's[1] motion for
summary judgment on her claims for sex discrimination, in
violation of Title VII of the Civil Rights Act of 1964, as
amended, 42 U.S.C. § 2000e, *et seq.*; age discrimination, in
violation of the Age Discrimination in Employment Act of
1967, 29 U.S.C. § 621, *et seq.*; disability discrimination, in
violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791,
*et seq.*; and for violations of the Equal Pay Act, 29 U.S.C.
§ 206(d). Because the district court erred in granting
summary judgment for the United States Postal Service on
Smith's claims for sex, age and disability discrimination, but
not in dismissing the Equal Pay Act claim, the Court
**AFFIRMS, in part,** and **REVERSES, in part,** the judgment
below.

_____

[1]The Defendant named in Smith's complaint is William J.
Henderson, Postmaster General, United States Postal Service. The
complaint appears to sue Henderson in his official capacity. For purposes
of this opinion, the Court refers to Defendant as the United States Postal
Service or USPS.

## I.

### *Substantive Facts*

In July, 1979, Plaintiff Mary Christine Smith began her career for the USPS as a distribution clerk in Evansville, Indiana. In September, 1986, Smith was transferred to Elizabethtown, Kentucky, where her title remained distribution clerk. At some point in 1986, Smith disclosed to her supervisors that she has rheumatoid arthritis, which "affects the mobility of [her] hands, legs and feet." (J.A. 7, Complaint, ¶ 8.) In 1997, Smith's physician limited her work time to 8 hours per day, 40 hours per week, and limited her lifting to no more than 20 pounds. The USPS's physicians and supervisory personnel approved of these work restrictions.

In early 1998, a panel of postmasters from the area surrounding Elizabethtown, Kentucky recommended Smith for promotion to customer service supervisor, Tour I, effective March 15, 1998. Tour I is the night shift at the post office when all mail must be off-loaded from the trucks, sorted and dispatched out to the associate post offices. One day before the effective date of her promotion, Smith met with her immediate supervisor, Tom Mullin, and Tony Conklin, a customer service supervisor. Mullin and Conklin allegedly attempted to talk Smith out of accepting the supervisor position. Smith nevertheless accepted the promotion.

According to Smith, after she became the Tour I Supervisor, she suffered through a series of events that ultimately left her no choice but to quit her job only four months later. Smith first complains that Conklin, with Mullin's consent, unilaterally altered work schedules that Smith had prepared for the employees she supervised. She argues that male supervisors' work schedules were never changed without their prior consent. In response, USPS explains that, because of the pending relocation of the

Elizabethtown Post Office, Mullin assigned Conklin to supervise Smith and the acting Tour II Supervisor, who was a male. According to Mullin, and confirmed by Conklin, Conklin altered Smith's staff assignments because "the work she anticipated that her staff would do that following night had been done during the day while she was gone, or because she had not most efficiently used her staff, and had made assignments which were going to cause overtime to be used." (J.A. 50, 63.)

Smith next complains that Mullin refused to authorize Smith to approve overtime for her employees. Smith claims that the overtime was necessary to manage the Tour I workload. According to Mullin, he refused the overtime requests because a supervisor "must balance work-load, overtime hours considering employees on vacation, and what work will be accomplished by the next tour after that Supervisor's employees leave for the day." (J.A. 48.) All of this balance must be accomplished with "an eye towards keeping costs down, and keeping efficiency – moving the mail – up." *Id.*

Smith also complains that Mullin refused to permit her to delegate the duty of facility-wide financial accounting to a subordinate employee, as he had permitted the male Tour I supervisors who had preceded her in that position. As a result, Smith's work day was lengthened, requiring her to work between 10 and 12 hours a day, in contravention of her medical restriction. For one stretch of time (between June 5 and July 5, 1998), Smith worked for thirty days straight without a day off. For another stretch (between July 2 and 17, 1998), Smith was required to work with only one or two days off.

The USPS concedes that the Tour I Supervisor's accounting duties are time-consuming. It points out that Conklin, Smith's male predecessor as Tour I Supervisor, used to spend two to three hours per day on the accounting function. The USPS argues that Mullin would have permitted Smith to

delegate the accounting functions to a subordinate, as long as "the assignment did not result in mail being delayed, if it did not violate the terms of the union contract, if it did not cause an increase in work hours and if it did not cause Elizabethtown to incur unnecessary overtime." (J.A. 48-9.) Mullin did not permit Smith to delegate these duties because Smith's mail production numbers were down, while the costs were up. Smith has acknowledged that production was down on Tour I because she was pulling a subordinate from the production line to perform the accounting work.

Smith next alleges that Mullin verbally berated her in front of subordinates, calling her "incompetent" on at least one occasion. (J.A. 9, 105-06.) Smith also points to deposition testimony of a USPS employee who stated that Mullin would publicly point out "every picky little thing he could possibly find" about Smith's job performance. (J.A. 102-03.) Mullin has not denied that he called Smith incompetent, but he does indicate that he held Smith accountable for doing her job, including with respect to the mistakes in her bookkeeping duties.

On May 3, 1998, Smith wrote Mullin a letter complaining about (a) the fact that she needed either Mullin's or Conklin's authorization for her requests for overtime, allegedly resulting in reduced staffing for Tour I; (b) harassment by Conklin, including his alleged mocking of her hand movements and statements about her standing with her hands in her pockets; and (c) being disparately treated in not being permitted to delegate some of her job duties, as Conklin had been permitted when he was the Tour I Supervisor. Mullin allegedly responded to Smith's letter by telling her that she was "now in a man's world" and accusing her of "always whining." (J.A. 9-10.)

Finally, Smith complains that Mullin directed her to underreport the hours she worked. Mullin denies this allegation, claiming that such a direction would have violated USPS policy.

On July 17, 1998, Mullin directed Smith to report for duty the following Monday, which was one of Smith's scheduled days off. "[E]xhausted and in constant pain," Smith resigned her position. (J.A. 10.) She applied for and was granted a disability retirement based on her physician's statement that she could not hold a full-time job.

### *Procedural History*

On June 5, 2000, Smith filed a complaint in the United States Bankruptcy Court for the Western District of Kentucky against the United States Postal Service. The case subsequently was transferred to the U.S. District Court. Smith's complaint alleged the following claims: (1) failure to reasonably accommodate her "medical limitations" as required by the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.*; (2) sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* because she was required to perform duties not required of similarly situated male employees; (3) violation of the Equal Pay Act, 29 U.S.C. § 206(d), because Smith was required to perform "duties in excess of the number of hours allocated therefor"; and (4) age discrimination in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.*

On November 30, 2001, the USPS moved for summary judgment on Smith's complaint, and the district court granted USPS's motion on August 1, 2002. In its memorandum opinion, the court ruled that Smith could not state a *prima facie* case for her discrimination claims under Title VII, the ADEA and the Rehabilitation Act because she did not suffer an adverse employment action. The court rejected Smith's argument that her voluntary resignation was a constructive discharge. The court reasoned that the alleged conduct by the USPS was not "'so intolerable that a reasonable person would feel compelled to resign.'" *Smith v. Henderson,* No. 3:00CV-515-S, slip op. at 4 (W.D. Ky. Aug. 1, 2002) (quoting *Turner v. Pendenis Club,* 19 S.W.3d 117, 121 (Ky. Ct. App. 2000)

(citing *Darnell v. Campbell Cty. Fiscal Ct.,* 731 F. Supp. 1309 (E.D. Ky. 1990)).  In support of her Equal Pay Act claim, Smith had argued that although her salary had been the same as her male counterparts, she was required to work longer hours and thus was effectively paid less for the same job.  The court rejected this argument because Smith actually was complaining of the same wages for different work, a claim which is not colorable under the Equal Pay Act.  Smith filed her notice of appeal on August 29, 2002.

## II

### A.   Standard of Review

The Court reviews a district court's grant of summary judgment *de novo,* and affirms such a judgment only if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  *Cotter v. Ajilon Serv., Inc.,* 287 F.3d 593, 597 (6th Cir. 2002).  "The Court should believe the evidence presented by the nonmovant, and draw all justifiable inferences in [her] favor."  *Id.*  (citing *Plant v. Morton Int'l, Inc.,* 212 F.3d 929, 933-34 (6th Cir. 2000)).

### B.   Analysis

#### 1.   Equal Pay Act Claim

Smith has presented absolutely no argument on appeal regarding the district court's dismissal of her Equal Pay Act claim.  Accordingly, she has waived her right to challenge the district court's grant of summary judgment for the USPS on that claim. *See Smoot v. United Transp. Union,* 246 F.3d 633, 647 (6th Cir.2001) ("This Court deems issues presented in a perfunctory manner on appeal to have been waived.").

#### 2.   Remaining Employment Discrimination Claims

Like the district court below, both Smith and the USPS have limited their legal argument as to the viability of Smith's age, sex and disability claims to the issue of whether Smith was constructively discharged.  Accordingly, this Court has limited its analysis to whether summary judgment was warranted solely on the ground that Smith did not suffer an adverse employment action in the form of a constructive discharge.

The existence of a constructive discharge "depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee."  *Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir. 1982).  A constructive discharge requires a determination that "'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"  *Id.* (quoting *Bourque v. Powell Elec. Mfg.,* 617 F.2d 61, 65 (5th Cir. 1980)).  *See also Policastro v. Northwest Airlines, Inc.,* 297 F.3d 535, 539 (6th Cir. 2002) (conditions supporting a constructive discharge "must be objectively intolerable to a reasonable person") (citations omitted).

Smith points to the following facts in support of her constructive discharge claim:  (1) Conklin, a supervisor like Smith, unilaterally altered the work schedules Smith had prepared for her employees; (2) Mullin, Smith's direct supervisor, refused to authorize Smith to approve overtime for her employees, which Smith claims was necessary to manage the  Tour I workload; (3) Mullin refused to permit Smith to delegate the duty of facility-wide financial accounting to a subordinate employee, as he had permitted other Tour I Supervisors to do, resulting in her working between 10 and 12 hours a day, in contravention of her medical restrictions; (4) Mullin criticized Smith in front of subordinates, calling her "incompetent" on at least one occasion; (5) Mullin called Smith a whiner after she had complained in writing about

Mullin's failure to authorize overtime for her employees, statements by Conklin that she perceived as "mocking," and not being permitted to delegate some of her job duties to subordinates; and (6) Mullin allegedly directed Smith to underreport the hours she had worked.

The above-described actions involve the manner in which the USPS supervised and/or criticized Smith's job performance and assigned job duties to her, actions which normally are insufficient to establish a constructive discharge as a matter of law. *E.g., Policastro,* 297 F.3d at 539 (holding that employee was not constructively discharged where the only aspect of her job that changed was that she would have to travel more frequently); *see also Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 496 (8th Cir. 1996) ("Dissatisfaction with a work assignment is, as a matter of law, normally not so intolerable as to be a basis for constructive discharge.") (citing *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir. 1994) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.")); *King v. AC & R Advertising,* 65 F.3d 764, 768-69 (9th Cir. 1995) (finding no constructive discharge where the plaintiff's employment status was changed from "for cause" to "at-will"; plaintiff's managerial responsibilities were reduced; and his base salary was reduced). But this case is not the typical constructive discharge case. Smith is alleging that the USPS failed to reasonably accommodate her disability as required by the Rehabilitation Act and that the failure-to-accommodate precipitated her involuntary resignation. Thus, the central issue is whether the USPS's alleged rescission of, or refusal to provide, a reasonable accommodation converted her resignation into a constructive discharge.

The EEOC's regulations pursuant to Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., set forth the relevant legal standards for a Rehabilitation Act claim against the USPS. *See* 29 U.S.C.

§ 791(g) (providing that complaints of nonaffirmative action disability discrimination under the Rehabilitation Act are governed by the standards under Title I of the ADA); 39 C.F.R. § 255.5 (USPS Rehabilitation Act regulation that adopts by reference the EEOC's ADA regulations set forth at 29 C.F.R. part 1614); 29 C.F.R. § 1614.203(b) (EEOC regulation providing that the Rehabilitation Act standards are the same as the ADA standards set forth at 29 CFR part 1630). Under these regulations, it would have been unlawful for the USPS not to make reasonable accommodation to Smith's known physical limitations, unless the accommodation would have imposed "an undue hardship on the operation of its business." 29 C.F.R. § 1630.9(a). A reasonable accommodation means, among other things, "[m]odifications or adjustments … to the manner or circumstances under which the position held or desired is customarily performed." *Id.* § 1630.2(o)(ii).

Smith was entitled to a reasonable accommodation at the USPS so long as she was a "qualified" individual with a disability, meaning that the modifications and adjustments she sought would have enabled her to perform the "essential functions" of the Tour I Supervisor job. *Id.*; see also *id.* § 1630.2(m); 39 C.F.R. § 255.5. The essential functions means the "fundamental job duties" of the position, not "marginal functions." *Id.* § 1630.2(n).

The USPS has conceded that Smith, who suffers from rheumatoid arthritis, is disabled and that it provided her a reasonable accommodation in 1997 so that she could perform her non-management position as a distribution clerk. *See* J.A. 42, *Mem. in Support of Motion for Summary Judgment* at 9 ("The record demonstrates and the Postal Service acknowledges that plaintiff is a person with a disability, and that the disability was accommodated given the restrictions that were in place for plaintiff since 1997."). That accommodation limited her work to no more than eight hours per day, 40 hours per week. It can be inferred from the record that the Tour I Supervisor position that Smith assumed in

1998 generally demanded more than 40 hours of work per week due in part to the accounting responsibilities. Further, if this Court assumes the truth of Smith's deposition testimony (as it must in this context), a reasonable jury could infer that, after Smith became Tour I Supervisor, Mullin rescinded the hours-of-work accommodation that she had enjoyed as a distribution clerk and/or refused to extend this accommodation to her new job. *See* J.A. 148 (Smith's deposition testimony; testifying that Mullin reminded her numerous times after she became a supervisor that she "was an exempt employee and [she] could work over 40 hours and *[her] medical restrictions didn't apply because [she] was an exempt employee*") (emphasis added).

Additionally, it can be inferred from the record that, after Mullin refused to honor the hours-of-work accommodation, he subsequently denied Smith another form of accommodation that effectively would have reduced her work hours in the Tour I Supervisor position. Via a letter dated May 3, 1998, Smith asked Mullin if she could delegate her financial accounting duties to a subordinate, as other Tour I Supervisors had done in the past. Since it is undisputed that the accounting duties were time-consuming and Mullin was aware of Smith's disability and her need to work restricted hours, a factfinder could infer that Smith's letter constituted a request for an accommodation that would have substantially shortened her work day, in line with her medical restrictions.

Such an inference would be reasonable even though Smith's letter did not use the word "accommodation" or specifically mention that she was seeking to delegate the accounting function because of her disability. The context in which the letter was written permits an inference that Mullin knew or should have known that Smith sought to delegate her accounting duties in order to make her job conform with her medical restrictions. Mullin was well aware of Smith's disability and her need for a medical restriction on her hours of work when she was a distribution clerk. As previously noted, Mullin told Smith that her medical accommodation

would no longer apply to her job as a Tour I Supervisor. Further, Smith's predecessor in the Tour I Supervisor job has stated that the accounting duties would take him anywhere from 45 minutes to three hours a day, suggesting that a delegation of these duties would have substantially shortened Smith's day. Taken together, these facts create a genuine issue of material fact as to whether the May 3, 1998 letter, which sought to delegate the accounting duties, was a request for a reasonable accommodation that triggered the USPS's obligation to participate, in good faith, in an "interactive process" with Smith as to potential reasonable accommodations. 29 C.F.R. § 1630.02(o)(3); *Brown v. Chase Brass & Copper Co., Inc.,* 14 Fed. Appx. 482, 487 n.2 (6th Cir. 2001) ("If an employer's unwillingness to engage in such a process leads to a failure to reasonably accommodate an employee, the employer might be liable under the ADA.") (citing *Beck v. University of Wis. Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996)). According to Smith, Mullin rejected her proposed accommodation, telling her that she was "now in a man's world" and accusing her of "always whining." Thus, if a jury were to find that Smith's May 3, 1998, letter constituted a request for a reasonable accommodation, there appears to be little dispute that the USPS flatly denied that request.

The USPS argues that Smith waived her right to request a delegation-of-accounting-duties accommodation because "she was told before she assumed the duties she would not be allowed to delegate [the financial accounting duties]." *Appellee's Br.* at 26. The USPS, however, fails to cite to any record evidence in support of this assertion. In any event, a qualified individual with a disability does not waive her right to an accommodation in the form of a modification of job duties simply by being apprised of the job duties before she commences work. If this were the rule of law, it is difficult to see how a disabled individual ever would be entitled to a reasonable accommodation, since people usually are aware of what their duties will be before they start a new job.

Given the precedent of prior Tour I Supervisors delegating the accounting function to subordinate employees (including to Smith before she was promoted), there also is a genuine issue of material fact as to whether the accounting duty was an essential function of the Tour I Supervisor position. As a non-essential function, the accounting duty potentially could have been reassigned to subordinate employees as a "reasonable" accommodation of Smith's disability. *See* 29 C.F.R. § 1630.2(o)(3) (noting that "[j]ob restructuring" may be a reasonable accommodation"); *Id.* Part 1630, App. (Interpretive Guidance on Title I of the ADA) ("An employer or other covered entity may restructure a job by reallocating or redistributing nonessential, marginal job functions.…An employer or other covered entity is not required to reallocate essential functions.").

And if a factfinder reasonably could infer that the accounting duty was a non-essential job function that could have been reassigned, there also is a genuine issue of material fact as to whether this accommodation would have imposed an "undue hardship" on the USPS, a circumstance that would have justified the USPS's denial of that accommodation. 29 C.F.R. § 1630.9(a). The USPS bears the burden of providing undue hardship,[2] but it has not set forth specific facts indisputably demonstrating that such an accommodation would have resulted in "significant difficulty or expense." 29 C.F.R. § 1630.2(p). Mullin states generally that he did not want Smith to delegate her accounting duties because "production was down and costs were up" due to Smith's use of clerks to perform the accounting. But it is not clear from the record that the lower production and increased costs amounted to significant difficulty or expense, especially

---

[2] *See Smith v. Ameritech,* 129 F.3d 857, 866 (6th Cir. 1997) (noting that the employer bears the burden of proving undue hardship) (citing *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1183 (6th Cir. 1996)).

when the USPS had permitted other Tour I Supervisors to use subordinate employees for the accounting function.

The USPS further argues that Smith was not permitted to delegate the accounting function because she did not know how to do it correctly. *See Appellee's Br.* at 26-27 ("It was not unreasonable to … not allow her to delegate the accounting until she, like Conklin [the former Tour I Supervisor], knew how to correctly perform it."). But the fact that Smith could not adequately perform a marginal job function suggests that it would have benefitted the USPS to assign that function to another employee. Ironically, the USPS's argument tends to show that the accommodation Smith requested was reasonable.

The USPS also has presented no evidence regarding other factors relevant to the "undue hardship" defense, such as the overall financial resources of the Elizabethtown Post Office, the overall financial resources of the USPS, and the impact on the Elizabethtown Post Office's ability to conduct business. 29 C.F.R. § 1630.2(p)(ii), (iii),(v). On the facts of this case, we believe that a jury is in the best position to weigh these factors.

To summarize, prior to Smith's promotion to Tour I Supervisor, the USPS was aware of Smith's disability and her medical need to avoid working overtime so as not to exacerbate her rheumatoid arthritis. The USPS had granted her an accommodation that limited her work as a distribution clerk to no more than eight hours per day, 40 hours per week. After Smith's promotion, however, the USPS refused to apply the restricted hours accommodation to her new position. There also is a genuine issue of material fact as to whether Smith requested, and was denied, an alternative accommodation in the form of being permitted to delegate the accounting duties of her supervisory position to a subordinate. This form of accommodation would have shortened Smith's work hours to better conform with her medical restrictions. In addition, there is a genuine issue of material fact as to

whether the two accommodations Smith sought (restricted hours and/or delegated accounting duties) would have constituted "reasonable" accommodations under the Rehabilitation Act, or would have posed an undue hardship to the USPS. The fact that the USPS had permitted Smith's predecessor in the supervisor position to delegate the accounting duties suggests that these duties were non-essential job functions that could have been delegated without posing such a hardship.

Assuming that Smith was denied a reasonable accommodation that forced her to work well in excess of her medical restrictions, a jury reasonably could infer that the USPS (through Mullin) knew that Smith's working conditions would become intolerable to a reasonable person suffering from her particular disability. As noted, Mullin rescinded and/or refused to honor Smith's hours-of-work accommodation that had been in place since 1997, denied Smith the reasonable accommodation of delegating her non-essential accounting duties, and forced her to work long stretches of over-forty-hour weeks with few or no days off, resulting in the foreseeable consequence that Smith's health would markedly deteriorate. Thus, a reasonable jury could conclude that the USPS knowingly and deliberately "turned its back" on Smith and, therefore, the USPS could foresee that Smith would be compelled to quit her job in order to preserve her health. *Cf. Johnson v. Shalala,* 991 F.2d 126, 132 (4th Cir. 1993) (holding that an employee who was provided some, but not all, of the reasonable accommodations she requested, could not quit and sue her employer under a constructive discharge theory, but recognizing "that a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge"); *Hurley-Bardige v. Brown,* 900 F. Supp. 567, 573 n.7 (D. Mass. 1995) (noting that a failure to provide a reasonable accommodation could result in a constructive discharge when, for example, an employer "refuse[s] to build a ramp or elevator for an employee confined to a wheelchair, making it impossible for

the employee to get to work"). The district court erred in ruling, as a matter of law, that Smith had not suffered a constructive discharge.

We do not believe that Smith's situation is comparable to that of employees who prematurely quit their jobs in apprehension that their situations would not improve. *See, e.g., EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 441 (7th Cir. 2000) (affirming summary judgment on constructive discharge claim premised on failure to accommodate disability; holding that quitting was not the only option available to the plaintiff because she could have discussed the need for accommodations with her supervisor). Those cases do not involve an individual like Smith, who allegedly was worked to exhaustion and poor health by an employer who was aware of the individual's disability, but nevertheless refused to honor a reasonable accommodation, and denied another, that would have precluded such an overwhelming workload.

We also do not believe that Smith had an affirmative duty under the Rehabilitation Act to request her old job back as a distribution clerk (along with the hours restriction that accompanied it) once she realized that she could not work the hours of a Tour I Supervisor. In many situations, such as the instant case, the duty to request one's former job back would immunize the employer's failure to abide by its legal obligation to provide a reasonable accommodation. The purpose of statutes like the Rehabilitation Act and the ADA is to prevent employers from discriminating "based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society." 42 U.S.C. § 12101(a)(7). Requiring a disabled employee to relinquish a promotion because an employer refuses to comply with the law by looking beyond the disability and providing a reasonable accommodation would flout this fundamental goal.

The Court also finds our Circuit's prior decision in *Johnson v. City of Saline,* 151 F.3d 564 (6th Cir. 1998), to be instructive. There, this Court rejected the argument that a disabled plaintiff, who allegedly had been denied a reasonable accommodation, could not sue the City of Saline for compensatory damages on the ground that the Plaintiff "himself chose to violate his medical restrictions" after being denied the requested accommodation. *Id.* at 573. The Court held that "the doctrine of avoidable consequences does not apply to intentional or continuous torts to which the city's actions [denying a reasonable accommodation] appear analogous." *Id.* 573-74 (citations omitted). If a disabled individual can recover damages even though he chooses to work beyond his medical restrictions after being denied a reasonable accommodation, it necessarily follows that such an individual can impose liability on a covered entity in this circumstance. Thus, in this case, Smith was not required to request her old job back after being denied accommodations that possibly would have enabled her to perform the Tour I Supervisor job, even though by failing to make this request she knowingly (but not willingly) worked beyond her medical restrictions, thereby hastening her physical deterioration.[3]

## III.

For the foregoing reasons, the district court erred in granting summary judgment for the United States Postal Service on Smith's claims for sex, age and disability discrimination, but not with respect to her claim under the Equal Pay Act. The district court's summary judgment order is **AFFIRMED, in part, REVERSED, in part,** and the case is **REMANDED** for proceedings consistent with this opinion.

---

[3] In any event, it is not clear from the record below whether Smith could have asked for her old job back because there is no indication that her former position was available.