NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0071n.06

Case No. 21-6245

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

CURT TOMLINSON,

       Plaintiff-Appellant,

v.

KRAUSS-MAFFEI CORPORATION,

       Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Feb 06, 2023
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

O P I N I O N

Before: BATCHELDER, BUSH, and DAVIS, Circuit Judges.

DAVIS, J., delivered the opinion of the court in which BUSH, J., joined. BATCHELDER, J. (pp. 22–24), delivered a separate opinion concurring in part and in the judgment.

DAVIS, Circuit Judge. Plaintiff Curt Tomlinson filed this employment-discrimination lawsuit against his former employer, Krauss-Maffei Corporation ("KMC") after resigning from the company. Tomlinson made claims for retaliation and failure to accommodate his post-traumatic stress disorder ("PTSD") in violation of the Americans with Disabilities Act ("ADA") and Kentucky's employment discrimination laws. The district court granted summary judgment to KMC on all of Tomlinson's claims, and he timely appealed. For the reasons stated below, we **AFFIRM**.

**I. FACTUAL BACKGROUND**

KMC, an international manufacturer of machinery and systems, produces and processes plastics and rubber. KMC employed Tomlinson as a Field Service Engineer ("FSE") from May

2016 until he resigned on August 24, 2018. His job responsibilities included performing installations, service, and systems maintenance at customer sites. Aeric Bouza, a service coordinator, gave Tomlinson his work assignments and schedules. Bouza's job responsibilities also included directing FSEs from site to site, troubleshooting with FSEs and customers, and generally answering the FSEs' day-to-day questions. Tomlinson and Bouza both reported to the service manager, John Wiley. Wiley's responsibilities included tracking the FSEs' work performance, which he did by reviewing customer feedback and soliciting comments from senior service engineers and service coordinators. Wiley used this information to conduct annual performance reviews of the FSEs.

### A. Tomlinson Discloses His PTSD to Human Resources

Tomlinson has suffered from PTSD since about 2013. He did not disclose this condition to KMC on his employment application or otherwise inform anyone at the company about it until February 17, 2017. On that day, Tomlinson sent an email to KMC's Director of Human Resources, Randy Hemmerle, and reported that another FSE, Mark Bigos, had been harassing him. Tomlinson disclosed in this email that he had PTSD but explained that he does not like to mention it because he does not want to be treated differently. Hemmerle followed up on Tomlinson's email with a phone call, during which Tomlinson requested that KMC not schedule him to work with Bigos again. Hemmerle in turn informed Wiley that Tomlinson and Bigos did not have a good working relationship and asked that he not schedule them together. Wiley agreed not to do so, and Hemmerle never mentioned Tomlinson's PTSD to Wiley or anyone else at KMC

### B. Performance Review and Follow-Up Call

On March 14, 2018, Wiley emailed Tomlinson his 2017 annual performance review, in which Wiley rated Tomlinson's overall performance as "not meet[ing] requirements."

Wiley explained in the email that the review was "very difficult," and that Tomlinson had "a good deal" of training but was still having problems in many areas. Wiley noted that Tomlinson's training had "not produced the desired results and [KMC] need[ed] [Tomlinson's] help in moving forward." According to Tomlinson's deposition, the unexpected negative evaluation "really set . . . off" his PTSD. (R. 45, PageID: 322)

Unhappy with Wiley's email, Tomlinson called Hemmerle to discuss; Hemmerle in turn advised Tomlinson to call Wiley about any concerns with his evaluation. Tomlinson then called Wiley, who explained that the review was based on feedback from KMC customers and employees. For example, three of KMC's customers complained about Tomlinson's services and at least one requested that KMC not send Tomlinson back to their site. Tomlinson maintained that the review was unjust. Wiley ultimately declared that he and Tomlinson would have to "agree to disagree" because the contents of the review were accurate. Tomlinson perceived Wiley's tone during the call to be "threatening," "defensive," and "aggressive." Though Wiley did not threaten his employment.

Following his call with Wiley, Tomlinson emailed KMC's general counsel, Jenny Beene-Skuban, expressing concerns about his review and stating that Wiley had been "threatening, harassing and . . . attack[ing his] PTSD." Beene-Skuban responded the next day via email, apologizing and requesting more details. Tomlinson did not respond to Beene-Skuban but emailed KMC's contract administrator nearly two weeks later to restate his complaint. Because the issue did not fall within her authority, the contract administrator forwarded Tomlinson's email to Beene-Skuban, who reached out again—without response.

### C. Medical Leave

The following month, Tomlinson took medical leave and applied for short-term disability benefits, which KMC approved. In support of his application for leave, Tomlinson submitted notes from health care providers confirming that he had PTSD and was not able to work until September 2018. While on leave, Tomlinson emailed KMC's president, Paul Caprio, restating his issue with his performance review and asserting that it had not been taken seriously. Caprio forwarded the email to Hemmerle, who then called Tomlinson the same day to discuss it and, when Tomlinson did not answer, left a voicemail requesting Tomlinson's availability for a call. Tomlinson replied via email three days later, apologizing for missing the call and stating that he needed advance notice before getting on a call, but Tomlinson still did not offer his availability. Hemmerle responded the same day, again requesting Tomlinson's availability.

After two weeks of silence, Hemmerle followed up with Tomlinson by email on June 1, 2018. Tomlinson took several weeks to reply. On June 20, 2018, Tomlinson explained that he had been having "a hard time wanting to call and talk . . . when [he did not] feel [that his] condition [was] taken seriously." Hemmerle responded the next day. In his email, Hemmerle explained that KMC would not take any action on Tomlinson's complaint based on the limited information provided, but he invited Tomlinson to offer details to help KMC address the issue.

Tomlinson responded weeks later by email requesting that KMC speak with two employees who would confirm that Wiley's comments in the performance review were false. Beene-Skuban was on vacation at this time but emailed Tomlinson shortly after she returned, reiterating that KMC had not found any issue with Wiley's evaluation. She further inquired as to how KMC could address the issue while being sensitive to Tomlinson's PTSD. Instead of responding, Tomlinson again emailed Caprio, restating his complaints. Caprio replied two days later reassuring

Tomlinson that KMC was taking his complaint seriously and stating that "I would like for you to come back to work when you are ready and we are very supportive of all of our employees . . . ."

### D. The Investigation and Accommodation Request

Tomlinson finally spoke with Beene-Skuban in late July 2018, requesting that KMC investigate his performance review, and allow him to report directly to Bouza instead of Wiley.[1] Beene-Skuban conducted an internal investigation of Tomlinson's claim from July 26 to August 13, 2018, which included speaking to several KMC employees and leadership.

Beene-Skuban had calls and exchanged emails with Tomlinson during and after the investigation to keep him apprised of the team's progress. She also asked Hemmerle whether KMC could transfer Tomlinson to another comparable position that would allow him to report to a different manager. However, no such positions were available. On August 20, 2018, KMC ultimately denied Tomlinson's request to report to Bouza and concluded that Wiley had not discriminated against him. In explaining KMC's reasoning on this point, Beene-Skuban testified that having FSEs report to service coordinators instead of service managers did not "seem" like an option because it was not a part of the company structure.

### E. Tomlinson Resigns and KMC Restructures Evaluation Process

Meanwhile, during the investigation described above, KMC decided that it would re-evaluate its process for performance reviews to consider lessening Wiley's workload by having service coordinators review the FSEs. This was because KMC had determined that Wiley was spread too thin. For example, when Wiley submitted the 2017 performance evaluations to Human Resources, Hemmerle noted seven instances where Wiley included the wrong FSE's name on their

---

[1] Tomlinson does not provide a date in his briefing for when he initially made the accommodation request. The court has not found anything in the record clearly establishing the date of the request, but the parties seemingly agree that he made it in July 2018.

respective evaluation and asked that he correct the names before distributing. One such mistake was found in Tomlinson's evaluation where Wiley inserted another FSE's name instead of Tomlinson's. Further review showed that Wiley essentially duplicated the two performance reviews. According to Hemmerle, service coordinators were well-suited to evaluate the FSEs because they already had daily contact with FSEs and reported to service managers on the FSEs' job performances. In Hemmerle's view, service coordinators would need training but could formally evaluate FSEs in Wiley's place. Though the company had discussed this plan to re-evaluate its performance review process during the investigation, Beene-Skuban did not disclose the plan to Tomlinson when she denied his request to report to Bouza.

On August 24, 2018, Tomlinson resigned from KMC. He began working for another company three days later. Shortly thereafter, KMC changed its review process to allow service coordinators, like Bouza, to conduct performance reviews for FSEs—Tomlinson's former position—to begin with the next evaluation cycle in January 2019. Under this process, as described by Wiley, the coordinators would complete the performance evaluations and then send to managers who would then review and forward the reviews to Human Resources before circulating to the FSEs.

## II. PROCEDURAL HISTORY

Tomlinson filed this lawsuit on May 31, 2019, alleging that KMC discriminated against him based on his PTSD. The Complaint includes claims of disability discrimination, failure to accommodate, and retaliation under the ADA and the Kentucky Civil Rights Act ("KCRA"), Ky. Rev. Stat. § 344.010 *et seq*. KMC moved for summary judgment, which the court granted as to all of Tomlinson's claims. Tomlinson timely appealed.

### III.  STANDARD OF REVIEW

We apply the de novo standard of review to district court orders granting summary judgment. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).  The court will affirm orders granting summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting FED. R. CIV. P. 56(c)).

### IV.  ANALYSIS

As a preliminary matter, the district court granted summary judgment to KMC on all of Tomlinson's claims including disability discrimination, failure to accommodate, and retaliation. However, in principal brief, Tomlinson only challenges the latter two findings.  KMC thus argues that Tomlinson has waived his disability discrimination claim.  Tomlinson makes no mention of disability discrimination as a separate claim in his reply brief, nor does he offer any analysis to support such a claim.  Instead, he only mentions "disability discrimination" once in the context of failure to accommodate.  Accordingly, we limit our review to his failure-to-accommodate and retaliation claims, consistent with the parties' briefing.  *See Doe v. Mich. State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021) ("Doe waived any appeal of the district court's decision regarding timeliness by failing to raise the issue in his initial brief.").

Moving on to the issues before us, as explained below, Tomlinson's failure-to-accommodate claims cannot survive.  While a jury could reasonably conclude that his request for a change in supervision was reasonable, KMC was not required to approve Tomlinson's first proposal such that he was excused from participating in the interactive process—a process required to identify an accommodation to address the precise limitations of his PTSD.  Additionally, his

retaliation claims fail because there is no question of fact as to whether he suffered an adverse employment action as a threshold to such a claim. He did not.

## A.      Failure to Accommodate

The district court found that Tomlinson's failure-to-accommodate claim failed for two reasons. First, requests for a change in supervision are generally unreasonable. Second, he did not engage in the interactive process to reach a solution as required of both the employer and employee when an employee requests an accommodation. We agree with the second finding but not the first. As further explained below, a reasonable juror could find that Tomlinson's request for a change in supervision was reasonable. However, summary judgment is still proper because the evidence shows that KMC was persistent in trying to reach a resolution with Tomlinson but he terminated the interactive process through his resignation.

### 1.  Reasonable Accommodation

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C.A. § 12112. This includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Id.* The Act defines "reasonable accommodation" to include:

> [J]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* § 12111(9).

Where, as here, the plaintiff's claim is "premised upon an employer's failure to offer a reasonable accommodation," it "necessarily involve[s] direct evidence (the failure to accommodate) of discrimination." *Kleiber*, 485 F.3d at 868. Accordingly, we substitute the

*McDonnell Douglas* framework that we typically employ for discrimination cases with the following:

> [Tomlinson] must show that (1) [he] was disabled within the meaning of the ADA; (2) [he] was otherwise qualified for [his] position, with or without reasonable accommodation; (3) [KMC] knew or had reason to know about [his] disability; (4) [he] requested an accommodation; and (5) [KMC] failed to provide the necessary accommodation.

*Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018); *see also Kleiber*, 485 F.3d at 868 (explaining why we use a different framework for failure-to-accommodate claims). Encompassed in the reasonableness prong of the above framework is a requirement that both parties communicate in good faith to reach an agreement on a reasonable accommodation. *Talley v. Fam. Dollar Stores of Ohio, Inc*., 542 F.3d 1099, 1108 (6th Cir. 2008) ("We have found that the interactive process is mandatory and both parties have a duty to participate in good faith.") (internal quotation marks and citation omitted). Once Tomlinson shows that the accommodation was objectively reasonable (which includes the "interactive process" requirement), the burden shifts to KMC to show that the accommodation would impose an undue hardship. *Id.* at 1110.

We assume for purposes of this analysis that Tomlinson is disabled, he was otherwise qualified for the FSE position at KMC, and KMC knew that he had PTSD when he requested a change in supervision. And the parties agree that KMC denied Tomlinson's request. That streamlines our inquiry to the second prong—i.e., whether Tomlinson's request was reasonable. *See Kleiber*, 485 F.3d at 870 (accommodation must be objectively reasonable).

The district court cited a footnote in an unpublished opinion, *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 (6th Cir. 2016), to conclude that "[t]he requested accommodation, a change of supervisor, is generally not considered 'reasonable' for purposes of an accommodation claim." While it may be true that such a request is *generally* unreasonable, our precedent informs

that presumptions regarding the reasonableness of an accommodation "eviscerate[] the individualized attention that the Supreme Court has deemed 'essential' in each disability claim." *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 782 (6th Cir. 1998) (quoting *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 (1987)); *see also US Airways, Inc. v. Barnett*, 535 U.S. 391, 405 (2002) (conducting individualized assessment even where the plaintiff's request ran afoul the employer's seniority system "(which the ADA may not trump in the run of cases)" "because special circumstances might [have] alter[ed] the important expectations" that justify protecting seniority systems). Importantly, in *Deister*, the case on which the district court rested its finding, we held that the plaintiff's failure to make the request for a change in supervision was fatal to his failure-to-accommodate claim. 647 F. App'x at 658. Though the court disposed of the issue of whether a request for a change in supervisor can constitute a reasonable accommodation under the circumstances of that case, it did not provide analysis on the issue presumably because it had resolved the plaintiff's claim on alternative grounds. *Id.*

A fresh look at the record evinces that a reasonable juror could conclude that Tomlinson's request was reasonable. After all, Beene-Skuban testified that the reason KMC denied the request was because it did not "seem" like an option that would fit within the company's structure. Critically, however, Hemmerle testified that, during Beene-Skuban's investigation of Tomlinson's complaints regarding Wiley's delivery of his performance review, KMC's leadership actually discussed revamping the evaluation process in a way that would have satisfied Tomlinson's request. Indeed, KMC planned to explore the idea of having the service coordinators (Bouza's position) conduct the performance reviews for FSEs (Tomlinson's position), instead of service managers (Wiley's position). All things considered, a reasonable jury could discern that Tomlinson's request was reasonable because not only was KMC considering doing the very thing

that Tomlinson requested *even before* Beene-Skuban denied his request, but KMC further *made and implemented* that change the following year.

KMC cites Wiley's and Beene-Skuban's testimony to argue that it ultimately did not modify the reporting structure but instead only delegated the initial draft of evaluations to service coordinators. Specifically, Wiley explained that he reviewed the evaluations prepared by the coordinators before forwarding to Human Resources, and Beene-Skuban testified that KMC leadership discussed easing Wiley's burden of conducting a disproportionate number of performance reviews. However, Hemmerle testified that "after some reorganization, [KMC] made a shift to how [it] handle[d] performance reviews;" namely, KMC "had the respective [service] coordinator for the group [of FSEs] provide the performance review to the employees that they were coordinating." Hemmerle did not indicate that the initial review was only cursory such that it would not amount to a change in KMC's reporting structure.

As such, the question of reasonableness would be ripe for a jury if the inquiry were to end here. However, it does not. As we explain below, because Tomlinson failed to engage in the interactive process required by the ADA to reach a mutually agreeable reasonable accommodation, his failure-to-accommodate claim cannot survive.

### 2. Interactive process

The ADA does not oblige "employers to make on-the-spot accommodations of the employee's choosing." *Brumley*, 909 F.3d at 840. Rather, the regulations acknowledge that determining the appropriate accommodation may require the employer "to initiate an informal, interactive process." 29 C.F.R. § 1630.2. This process functions to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* And "[e]ven though the interactive process is not described in

the statute's text, [it] is mandatory, and both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871. Causing unnecessary delays, obstructing the process, and/or failing to adequately communicate or provide information during the process may evidence a party's bad faith. *Brumley*, 909 F.3d at 840. Where a party fails to participate in good faith, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Kleiber*, 485 F.3d at 871.

For example, the plaintiff in *Brumley* worked as a sorter and driver for United Parcel Service, Inc. ("UPS") and injured her back on the job. 909 F.3d at 836. She took a leave of absence. *Id.* The day she returned, the plaintiff gave UPS a doctor's note indicating that she could only work in "local sort," a subset of her sorter position. *Id.* UPS did not approve her request that day, but instead sent her home and initiated the interactive process to identify the appropriate accommodation. *Id.* at 837–38. UPS sent the plaintiff three letters that she did not answer until nearly a month later, finally sending the requested information and coordinating time for a meeting. *Id.* at 838. When UPS explained at the meeting that the company would try to find a reasonable accommodation based on the plaintiff's restrictions, she stated that she would instead ask her doctor to remove her restrictions and return to work, effectively discontinuing the interactive process. *Id.* When the plaintiff later sued UPS for failure to accommodate her disability, we explained that "[a]n employer's refusal to provide an accommodation to the position of the employee's choice immediately upon the employee's request is not, in and of itself, a failure to accommodate under the ADA." *Id.* at 840. Rather, "UPS had discretion to provide a reasonable accommodation as identified through the interactive process." *Id.* But because the plaintiff "voluntarily abandoned the process, UPS [was] not liable for failing to provide a reasonable accommodation." *Id.*

Here, the district court found that Tomlinson failed to engage in the interactive process. We agree. Tomlinson contends that he only failed to communicate as a result of his PTSD, and that the lag in communication occurred before the interactive process was triggered. To begin, our precedent does not require employees to recite any particular buzz words for us to find that an accommodation was requested. *See Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004) ("The context in which the letter was written permits an inference that [the employer] knew or should have known that [the employee] sought to delegate her accounting duties in order to make her job conform with her medical restrictions."). The record supports that Tomlinson made clear that he wished to be accommodated based on his disability even before he made the specific request for a change in supervision. Starting with his first call to Hemmerle after receiving his written performance review, until the moment that he resigned, Tomlinson made clear that he had an issue with Wiley and wanted KMC to take some sort of action. For instance, in his first communication to the company's general counsel, Beene-Skuban, Tomlinson indicated that Wiley made threatening and harassing comments which Tomlinson felt were an attack on his PTSD. He later followed up with the president of the company stating that the only request he had made thus far was to not "deal with bullying or harassment." Though he did not state specifically that he wanted to report to Bouza instead of Wiley, KMC should have reasonably inferred that he had an issue working with Wiley such that it was appropriate to initiate an interactive process to reach a resolution, which is exactly what it did. KMC repeatedly attempted to initiate a discussion with Tomlinson to hear more about his concerns and Beene-Skuban explicitly stated in one of the emails that she wanted to be "sensitive to" Tomlinson's PTSD.

But after Tomlinson took medical leave, he became largely unresponsive, demanding that KMC give him advanced notice before contacting him, yet neglecting to provide the company with

his availability. In this vein, Tomlinson's argument that he could not participate in the process on account of his PTSD is unpersuasive. KMC offered him the option to set up a phone call or continue discussing through email, and it also welcomed him to suggest other means of communication more amenable to him. For example, Hemmerle stated in one of his several emails that he and Beene-Skuban attempted multiple times to discuss Tomlinson's concerns with him to no avail, and that "if phone calls [were] detrimental to [Tomlinson's] condition then [Hemmerle was] happy to continue using email." And, though she did not inform Tomlinson, Beene-Skuban even reached out to Human Resources during her investigation to determine whether KMC could transfer Tomlinson to another position so that he could report to a different manager. However, there were no openings. The record suggests that Tomlinson is to blame for the breakdown of the interactive process, not KMC. *See Kleiber*, 485 F.3d at 871.

Moreover, even assuming that the interactive process was not triggered until Tomlinson made the request to report to Bouza instead of Wiley, a reasonable juror cannot conclude that he engaged in the mandatory interactive process in good faith. Tomlinson argues that KMC "completely sidestep[ped]" the process by failing to explore alternatives to his request. The record tells a different story. Tomlinson terminated the interactive process by resigning when KMC rejected his specific accommodation, even after the company made clear from the start of Tomlinson's complaint that it wanted to work with him to identify a reasonable accommodation. And after KMC rejected Tomlinson's request, KMC advised him in writing that it intended to have a "face-to-face meeting" upon his return to further discuss next steps. Just like the employee in *Brumley* who terminated the process before the parties could agree on a reasonable accommodation, so did Tomlinson when he resigned instead of discussing alternative accommodations with KMC—a discussion that KMC tried several times to foster. *See* 909 F.3d

at 840; *see also Arndt v. Ford Motor Co.*, 716 F. App'x 519, 528 (6th Cir. 2017) (affirming summary judgment where employee terminated interactive process by resigning).

Of note, though unclear from the briefing, it appears that Tomlinson argues that he requested a pre-return phone call as an accommodation to support his failure-to-accommodate claim. This claim fails as well. KMC attempted several times throughout the course of Tomlinson's medical leave to schedule a call and ultimately offered to set up an in-person meeting upon his return from medical leave. Assuming Tomlinson made this request, he is not entitled to cherry-pick the accommodation of his liking among reasonable alternatives. *See Brumley*, 909 F.3d at 840 ("[Employer] had discretion to provide a reasonable accommodation as identified through the interactive process."). Tomlinson cites no case law or evidence to support that KMC's offer to discuss upon his return was insufficient. Notwithstanding, we are satisfied that the record does not support that Tomlinson made such a request. Indeed, while he is not required to say any particular buzz words if the context of his complaints suggests that he is attempting to make a request for an accommodation, *see Smith* 376 F.3d at 535, he testified that the *only* accommodation request he made was for a change in supervision. A finding contrary to this testimony would not be sound, as it dissolves any dispute as to whether he made the request.

Accordingly, the district court correctly held that Tomlinson's failure-to-accommodate claim ends here, negating the need to analyze whether Tomlinson's request would have imposed an undue hardship on KMC.

### B.   Retaliation

The district court found that Tomlinson's retaliation claim failed because he could not establish a genuine dispute of material fact as to whether he faced an adverse employment action. The record leads us to the same conclusion.

The ADA prohibits discrimination against an individual based on his opposition to certain unlawful acts or practices. 42 U.S.C. § 12203(a). Where, as here, the plaintiff relies on indirect evidence to establish retaliation, we analyze his claim under the *McDonnell Douglas* burden-shifting approach:

> The plaintiff bears the initial burden to establish a prima facie case of retaliation, which requires a showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action.

*Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). Relevant to our analysis is the third prong, as the record does not establish that KMC took any adverse employment action. For his part, Tomlinson maintains that KMC's failure to accommodate him regarding his requests for a change in supervision and a pre-return call amounted to adverse actions. It is possible for an employee to establish constructive discharge through a showing of the employer's complete failure to accommodate. *See Talley*, 542 F.3d at 1109 ("a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge.") (quotation marks omitted). Tomlinson's argument, however, is premised on claims that we have already established are fatal and accordingly fails at the gate. As explained above, KMC did not fail to accommodate Tomlinson.

Tomlinson next points to a theory of constructive discharge to establish that KMC took an adverse action against him. As the district court correctly noted, constructive discharge can satisfy the adverse action element of employment discrimination claims. *See Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005).[2] We have described constructive

---

[2] *Saroli* analyzes constructive discharge as an adverse employment action under the FMLA rather than the ADA. 405 F.3d at 451. However, it is still instructive here because FMLA and ADA can be analyzed under the same framework. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004)

discharge as "a tough row to hoe" as such claims are not easy to prove. *Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 630 (6th Cir. 2018). "A constructive discharge occurs when 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 814 (6th Cir. 2020) (quoting *Talley*, 542 F.3d at 1107). More specifically, "the employer must have created an objectively intolerable work environment to deliberately force a disabled employee to resign." *Id.* Employees who leave "in apprehension that conditions may deteriorate later" will not prevail. *Id.* (quoting *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002)). That is, if other forms of relief are available to employees, they are expected to try to resolve the issue instead of resigning. *Id.*

For instance, in *Goening*, we held that the plaintiff could not use her employer's criticism of her decision to take protected leave to establish that her work conditions were intolerable. 884 F.3d at 631. We reasoned in part that "this circuit has repeatedly held that an employer's criticism of an employee does not amount to constructive discharge—especially when the employer's criticism is limited to a few isolated incidents." *Id.* We reached the same conclusion in *Savage v. Gee*, where the record showed that the faculty members of a university were critical of the plaintiff librarian's book suggestions, were uncomfortable with his research skills and publicly challenged his professionalism. 665 F.3d 732, 739 (6th Cir. 2012). We reached this conclusion again in *Arndt*, where we acknowledged that the plaintiff may have felt that the employer badgered and disrespected him about his PTSD, but the employer considered both of his requests for

---

("We evaluate a claim of FMLA retaliation the same way that we would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII"); *Crouch v. J C Penney Corp. Inc.*, 337 F. App'x 399, 402 (5th Cir. 2009).

accommodation and placed him on medical leave while the second request was being considered. 716 F. App'x at 530.

Tomlinson points to the following facts to make his case: (1) the information in the review was inaccurate and intended for another FSE, as evidenced by Wiley's inadvertent inclusion of the wrong name on the first draft; (2) Wiley used a "defensive, hostile, and threatening" tone when Tomlinson tried to discuss the review; and (3) Tomlinson was concerned that further interactions with Wiley would trigger his PTSD symptoms.

Beginning with the first point, we agree that Wiley's mistake, along with the identical evaluations, may suggest that the review was inaccurate and hastily prepared. But it is well established that "a court does not sit as a 'super-personnel department,' second-guessing management decisions." *Hardesty v. Kroger Co.*, 758 F. App'x 490, 496 (6th Cir. 2019) (citing *Krenik v. County of Le Sueur*, 47 F.3d 953, 960 (8th Cir. 1995)); *see also Holmes v. Potter*, 384 F.3d 356, 361 (7th Cir. 2004). Wiley made the same mistake on the initial reviews for seven employees, not just Tomlinson. We are not inclined to conclude that an employee can establish constructive discharge by proving that his manager made careless mistakes or included inaccurate information on one of his performance reviews.

Tomlinson's second and third points are similarly unpersuasive. A plaintiff's testimony that an employer used a threatening tone, without more, is not enough under the circumstances of this case. *See Brister v. Mich. Bell Tel. Co.*, 705 F. App'x 356, 360 (6th Cir. 2017) (evidence of "humiliation and criticism," and evidence that the plaintiff was called "stupid" and told that she should "seek psychological help," was not enough absent evidence that the harassment "manifested in a demotion, reduction in salary, or reduction in job responsibilities"); *Goening*, 884 F.3d at 631 (holding the plaintiff could not use her employer's criticism of her decision to take

protected leave to establish that her work conditions were intolerable). Even assuming Wiley did use a threatening tone during the review, Wiley testified that he only interacted with Tomlinson about twice a year and Tomlinson corroborated this testimony in his briefing. *See id.* ("[T]his circuit has repeatedly held that an employer's criticism of an employee does not amount to constructive discharge—especially when the employer's criticism is limited to a few isolated incidents."). Further, Tomlinson was on medical leave at the time he resigned, lessening his chance of encountering Wiley at the time of his resignation even more. And the record supports that KMC offered to set up a meeting with Tomlinson upon his return to ensure that Tomlinson felt heard, evidencing KMC's efforts to make the working conditions tolerable for everyone.

Tomlinson principally relies on two cases to resist this finding: *Smith*, 376 F.3d 529, and *Talley*, 542 F.3d 1099. However, we are not persuaded that these cases warrant the opposite conclusion. First, the plaintiff in *Smith* succeeded on her constructive discharge claim because she established a dispute of fact regarding her failure-to-accommodate claim. *See* 376 F.3d at 537 ("Assuming that [the employee] was denied a reasonable accommodation . . . a jury reasonably could infer that [her employer] knew that [the employee's] working conditions would become intolerable to a reasonable person suffering from her particular disability."). The same is not true for Tomlinson, as we have already explained above why his failure-to-accommodate claims fail and accordingly cannot serve as the basis for his constructive discharge claim. Consistent with our holding today, we specifically noted in *Smith* that the way an employer supervises and/or criticizes an employee's job performance and assigns job duties are actions that "*normally* are insufficient to establish a constructive discharge." *Id.* at 534 (emphasis added). We only departed from the norm in *Smith* because that plaintiff established her failure-to-accommodate claim. *See id.*

Turning to *Talley*, we held that "when an employee makes a repeated request for an accommodation and that request is both denied and no other reasonable alternative is offered, a jury may conclude that the employee's resignation was both intended and foreseeable." 542 F.3d at 1109. Tomlinson's reliance on *Talley* is similarly unconvincing. There, we "emphasize[d] that our holding [did] not pave the way for an employee to assert a claim for constructive discharge every time an employer fails to accommodate her disability." *Id.* To be sure, we reiterated the importance of the ADA's requirement that both parties participate in an interactive process to reach an agreed reasonable accommodation. *Id.* at 1110. But as we explain above, the record establishes that Tomlinson terminated the process, thereby precluding him from using his failure-to-accommodate claim as a gateway to a constructive discharge claim.

Notably, this circuit has interpreted constructive discharge to include an element of intent. *See Talley*, 542 F.3d at 1107 ("A constructive discharge claim . . . requires an inquiry into the intent of the employer") (quoting *Smith*, 376 F.3d at 533). However, the Supreme Court raised a question as to whether intent was properly considered as an element in constructive discharge claims when it stated:

> The whole point of allowing an employee to claim "constructive" discharge is that in circumstances of discrimination so intolerable that a reasonable person would resign, we treat the employee's resignation as though the employer actually fired him. We do not also require an employee to come forward with proof—proof that would often be difficult to allege plausibly—that not only was the discrimination so bad that he had to quit, but also that his quitting was his employer's plan all along.

*Green v. Brennan*, 578 U.S. 547, 560 (2016) (citation omitted). We acknowledged this issue in *Tchankpa* but found no reason to resolve it in that case because the plaintiff had not shown that his workplace was objectively intolerable. 951 F.3d at 815-16. We reach the same conclusion here and accordingly see no need to answer the question today. *See id.* (declining to answer this

"question of first impression" but acknowledging that *Green* "arguably" dispensed of the intent component). Accordingly, Tomlinson's retaliation claim fails.

### V. CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.

**ALICE M. BATCHELDER, Circuit Judge, concurring.** I concur in the judgment and part of the analysis that leads to that judgment. I do not agree that a reasonable jury could conclude that Tomlinson requested an objectively reasonable accommodation.

Tomlinson alleges that KMC discussed its plan to re-evaluate its performance review process during the investigation of his discrimination claim. He also alleges that Beene-Skuban failed to disclose this plan when she denied Tomlinson's request to report to Bouza. These claims, however, are not supported by the record.

For ease of understanding, I will consider Tomlinson's question about whether he could report to Bouza instead of Wiley as a request for an accommodation. But not only is it questionable whether this should be considered as such a request, the record contains no other evidence that Tomlinson ever made such a request. Nor can I find any evidence that Beene-Skuban ever denied any such request. Indeed, Tomlinson walked back his request to work with Bouza, saying that he could still work with Wiley because he did not have much contact with him.

The record also reflects that KMC issued its report of the investigation on August 20, 2018. The report did not discuss any accommodation request, nor did it deny any request. It simply informed Tomlinson that no discrimination occurred and that KMC wanted to meet with him upon his return to work to discuss a path forward. The following day (August 21, 2018), Beene-Skuban, Hemmerle, and Caprio met to discuss lessons learned from the investigation. At the meeting, KMC decided to re-evaluate its performance-review process because of Wiley's heavy workload. Part of this discussion included having employees in Bouza's position conduct the initial performance evaluation for Wiley, who would then review the evaluation and send it to Human Resources for final approval. The service coordinators did not become supervisors or managers because of this change. This change was implemented several months after Tomlinson resigned.

With these facts in mind, I cannot find that a reasonable jury could conclude that Tomlinson requested a reasonable accommodation. To make a claim that KMC failed to accommodate his disability, Tomlinson must show that he requested an objectively reasonable accommodation. *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1110. Here, if Tomlinson made a request, it was a request for a change in his supervision; a change in supervision is not generally considered a reasonable request but must be individually considered in each case. *See, e.g.*, *US Airways, Inc. v. Barnett*, 535 U.S. 391, 405 (2002); *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 n.2 (6th Cir. 2016); EEOC Enforcement Guidance, Reasonable Accommodation and Undue Hardship, No. 915.002, Answer to Question 33 ("An employer does not have to provide an employee with a new supervisor as a reasonable accommodation," but "the ADA may require that supervisory methods be altered as a form of reasonable accommodation." ).

Tomlinson argues that his request to report to Bouza was an objectively reasonable accommodation because KMC changed its performance evaluation process after he resigned. However, Tomlinson did not request that Bouza complete his performance evaluation instead of Wiley. He asked for Bouza to be his supervisor instead of Wiley. Not only is a change-in-supervision request generally not reasonable, but the facts show that it was objectively unreasonable here. Bouza was not a supervisor or manager. Instead, Bouza also reported to Wiley and continued to report to Wiley after the evaluation process was changed. A company does not have to change its reporting structure to accommodate an employee's disability.

Furthermore, KMC did not begin discussing the idea of changing who initially drafts performance reviews until *after* it informed Tomlinson that no discrimination had occurred. And the record reflects that KMC intended to discuss accommodations with Tomlinson upon his return. The fact that KMC made and implemented a change afterwards, even though the change might

have accommodated Tomlinson, is not a basis for a jury to find that Tomlinson's request was objectively reasonable, especially when the change KMC made was not the accommodation Tomlinson requested.

Therefore, I cannot not conclude that Tomlinson's request was objectively reasonable. But, I certainly agree with the majority that Tomlinson's failure-to-accommodate claim cannot survive because Tomlinson failed to engage in the interactive process, as required by the ADA. I concur.